Buster WELCH, et al., Plaintiffs,

v.

UNITED STATES AIR FORCE, et al., Defendants.

Civil Action No. 5:00–CV–392–C.

United States District Court, N.D. Texas, Lubbock Division.

March 24, 2003.

Frank M. Bond, Simons Firm, Santa Fe, NM, Timothy T. Pridmore, McWhorter Cobb & Johnson, Lubbock, TX, for Plaintiffs.

John R. Parker, U.S. Attorney's Office, Dallas, TX, for Defendants.

## MEMORANDUM OPINION AND ORDER

CUMMINGS, District Judge.

On this date the Court considered Plaintiffs' Motion for Summary Judgment filed on September 17, 2002, by Buster Welch, *et al.* ("Plaintiffs"). Defendants' Response to Plaintiffs' Motion for Summary Judgment was filed by the United States Air Force, *et al.* ("Defendants") on November 15, 2002. Plaintiffs' Reply in Support of Motion for Summary Judgment was filed on December 18, 2002. The Brief by *Amicus Curiae* The State of Texas was filed on September 23, 2002. Defendants' Response to State of Texas' *Amicus Curiae* Brief and Brief in Support was filed on November 18, 2002. After considering all the relevant arguments and evidence, the Court **DENIES** Plaintiffs' Motion for Summary Judgment.

On this date the Court concurrently considered Defendants' Motion to Strike Extra–Record Declarations and Materials Attached to Plaintiffs' Motion for Summary Judgment filed on November 15, 2002. Plaintiffs' Response to Defendants' Motion to Strike Extra–Record Declarations and Materials Attached to Plaintiffs' Motion for Summary Judgment was filed on December 18, 2002. Defendants filed no reply. After considering all the relevant arguments and evidence, the Court **GRANTS** Defendants' Motion to Strike Extra–Record Declarations and Materials Attached to Plaintiffs' Motion for Summary Judgment.

On this date the Court concurrently considered Plaintiffs' Motion to Strike Defendants' Declarations filed on December 18, 2002. Defendants' Response to Plaintiffs'

Motion to Strike Defendants' Declarations was filed on January 15, 2003. Plaintiffs' Reply in Support of Plaintiffs' Motion to Strike Defendants' Declarations was filed on January 30, 2003. After considering all the relevant arguments and evidence, this Court **GRANTS** Plaintiffs' Motion to Strike Defendants' Declarations.

On this date the Court concurrently considered Defendants' Motion to Strike Materials Attached to Plaintiffs' Reply in Support of Motion for Summary Judgment and Response to Defendants' Cross–Motion for Summary Judgment filed on January 15, 2003. Plaintiffs' Response to Defendants' Motion to Strike Materials Attached to Plaintiffs' Reply in Support of Motion for Summary Judgment and Response to Defendants' Cross–Motion for Summary Judgment was filed on January 30, 2003. Defendants filed no reply. After considering all the relevant arguments and evidence, this Court **GRANTS** Defendants' Motion to Strike Materials Attached to Plaintiffs' Reply in Support of Motion for Summary Judgment and Response to Defendants' Cross–Motion for Summary Judgment.

On this date the Court concurrently considered Defendants' Cross–Motion for Summary Judgment filed on November 15, 2002. Plaintiffs' Response to Defendants' Cross–Motion for Summary Judgment was untimely filed on December 18, 2002. Defendants filed no reply. After considering all the relevant arguments and evidence, the Court **GRANTS** Defendants' Cross–Motion for Summary Judgment.

## I.

## FACTUAL BACKGROUND

### A.  *Parties*

The twenty-eight Plaintiffs in this case are landowners or business operators situated in Borden, Dawson, Dickens, Fish-er, Garza, Glasscock, Howard, Kent, Loving, Lubbock, Martin, Mitchell, Nolan, Reeves, Scurry, and Stonewall Counties in west Texas. Plaintiffs collectively own or control approximately 530,000 acres of land which are used for, *inter alia,* cattle and horse ranching; farming; public and private hunting, fishing, camping, and other recreational activities; unscheduled aerial agricultural spraying and predator control; private aviation training; and a proposed residential development of 400–450 single-family homes. In addition, utilizing private takeoff and landing strips on their respective ranches, at least two of the Plaintiffs own multiple private small aircraft used to conduct unscheduled overflights of their ranches to check on livestock. The half-million-plus acres are described as "variable terrain with river valleys, peaks and flat country."

Defendants include the United States Air Force, the United States Department of Defense, the United States Secretary of the Department of Defense, and various individual United States military personnel sued in their official capacities.

### B.  *Final Environmental Impact Statement*

In January 2000 Defendants made public a Final Environmental Impact Statement ("FEIS") which had been prepared to assist Defendants in determining whether to implement the Realistic Bomber Training Initiative ("RBTI"). Of the four alternatives evaluated by the FEIS to fulfill the purpose of the RBTI, Defendants elected to implement Alternative B. The RBTI's purpose is to establish a set of linked training assets (1) to permit aircrews from Barksdale Air Force Base ("AFB") and Dyess AFB to train for various missions while maximizing combat training time; (2) to provide linkage of airspace and other assets that support re-

alistic training of bomber aircrews; and (3) to ensure flexibility and variability in the training of support bomber combat missions.

The four RBTI alternatives consisted of

**Alternative A** No Action;

**Alternative B** Instrument Route ("IR")–178/Lancer Military Operations Area ("MOA"), 85 percent existing airspace;

**Alternative C** IR–178/Texon MOA, 80 percent existing airspace;

**Alternative D** IR–153/Mt. Dora MOA, 90 percent existing airspace.

Under Alternative A, Defendants' bombers would continue to use existing airspace and existing Electronic Scoring Sites ("ESS") at current levels. Alternatives B, C, and D each involve (1) changes in the structure and use of the airspace, including some additional airspace and some eliminated airspace; (2) decommissioning the ESS at both Harrison, Arkansas, and La Junta, Colorado; and (3) construction of ten new electronic threat emitter sites and two ESS. Alternatives B and C lie almost wholly in western Texas, while Alternative D is located in northeastern New Mexico.

Defendants admit that aircraft noise levels would increase 2–13 decibels ("dB") in Alternatives B and C airspace and 1–18 dB in Alternative D airspace. The percentage of "highly annoyed" persons could rise under Alternative B, IR–178, by eight percent, and Defendants concede that increases in noise levels from RBTI aircraft could be perceived by some as affecting their quality of life.

Defendants also acknowledge that Alternatives B and C would necessitate overflights of two special use land management areas (*e.g.,* state parks, scenic rivers) but point out that Alternative D would necessitate overflights of thirteen such areas. Both Alternatives B and C would cause a potential disturbance of the *aplomado* [lead-colored] falcon historic range where eleven sightings of *aplomado* falcons have occurred since 1992, but Mexican spotted owls and bald eagles, both federally listed as threatened or endangered species, are found within Alternative D's airspace.

## C. Record of Decision

After considering the FEIS and the environmental consequences involved with each of the above alternatives, together with public comments and agency input, Defendants signed the Record of Decision ("ROD") for the RBTI on March 24, 2000, and elected to implement Alternative B. Defendants assert that they selected Alternative B because the proposed RBTI operational and training assets located within approximately 600 nautical miles of Alternative B's Barksdale and Dyess AFBs would include

1. A Military Training Route ("MTR") that

    (a) offers variable terrain for use in terrain-following and terrain-avoidance training flights;

    (b) overlies lands capable of supporting electronic threat emitters and ESS that permit flights down to 200 feet above ground level ("AGL"); and

    (c) links to a MOA.

2. A MOA measuring at least 40x80 nautical miles with a floor of 3,000 feet AGL and extending to 18,000 feet above mean sea level ("MSL") used for avoiding simulated threats and simulated attacks.

3. An Air Traffic Control Assigned Area ("ATCAA") above the MOA at 18,000 to 40,000 feet MSL to be used for high-altitude training.

4. Availability of, through lease or purchase, a set of five locations (15 acres

each) under or near the MTR corridor, and an additional five locations (15 acres each) under or near the MOA, for placing electronic threat emitters that would simulate the variety of realistic threats expected in combat.

5. Two ESS which would be co-located with operations and maintenance centers, one under or near the MTR corridor and the other en route from the AFBs to the MTR and MOA, each to be constructed on leased, purchased, or Air Force-owned property.

Defendants' ROD also confirmed the decommissioning of two existing ESS located in Harrison, Arkansas, and La Junta, Colorado. Defendants contend that these existing sites do not provide the required operational training assets outlined in 1–3 above.

Defendants have also presented mitigation measures designed to reduce the potential for adverse effects to citizens and resources, including, but not limited to

1. reevaluating the potential impact of the *aplomado* falcon habitat;

2. considering construction alternatives in connection with roads, telephone lines, and power lines;

3. raising the AGL floor of several segments of IR–178 from the proposed 200 feet AGL to 300 feet AGL, and raising the floor of IR–178 reentry routes to 6,000 feet MSL;

4. relocating ESS and electronic threat emitter sites to avoid historical sites, homes, large structures, and obvious bodies of water; and

5. limiting the annual sortie operations to pre-RBTI levels of 1,560/year (about 6/day).

### D. Plaintiffs' Claims for Relief

**First:** Violation of the National Environmental Protection Act ("NEPA"), Failure to Adequately Prepare Environmental Impact Statement ("EIS")

Plaintiffs allege (1) that Defendants' FEIS failed to take a "hard look" at the adverse consequences the RBTI would have on the quality of both human and wildlife environments and (2) that Defendants negligently or deliberately misrepresented, distorted, or undervalued comments, records, studies, and other documents used to formulate the FEIS.

**Second:** Violation of NEPA, Failure to Adequately Consider Cumulative Impacts

Plaintiffs argue that Defendants have failed to consider the "absolute quantitative adverse" consequences and cumulative environmental harm of the RBTI's full range of airspace proposals. Plaintiffs contend that Defendants have incorrectly treated all of the airspace modifications and expansions as discrete projects and programs subject to individual NEPA analysis. Plaintiffs insist that Defendants be required to prepare a "programmatic EIS."

**Third:** Violation of NEPA, Improper Scope of Environmental Document

Plaintiffs argue that Defendants failed to adequately analyze the effects of the entire scope of the RBTI's expansion of military training airspace and bombing range capability. Plaintiffs complain that, contrary to federal regulations which require federal agencies to assess in a single comprehensive NEPA document the effects of all stages of a project and all connected, cumulative, or similar actions, Defendants have improperly segmented interrelated and/or connected projects or cumulative or similar actions, thus rendering Defendants' decisions arbitrary and capri-

cious or otherwise not in accordance with the law.

**Fourth:** Violation of NEPA, Failure to Consider Reasonable Range of Alternatives

Plaintiffs argue that Defendants considered only three alternatives in addition to the statutorily mandated No Action alternative. Plaintiffs complain that Defendants failed to consider whether offshore training routes would be feasible, whether airspace which already exists in South Dakota and Utah could continue to be utilized, whether the electronic threat emitters and ESS currently in place were adequate, or whether Kansas, Louisiana, or other mobile sites might be suitable.

**Fifth:** Violation of NEPA, Failure to Adequately Consider Environmental Impacts

Plaintiffs complain that Defendants failed to take a hard look at the environmental impacts of the RBTI on noise levels; human safety and health; medical evacuation flights; human and livestock annoyance; air quality; wildlife and birds; private property values; local customs and cultures of affected communities; ranching; commercial hunting and fishing operations; recreational activities; irreversible disturbances of productive grazing land by the electronic threat emitters; and the overall human environment and human condition, including the socioeconomic custom and cultural impacts of the RBTI on the residents of Lubbock, Texas.

**Sixth:** Violation of the Noise Control Act ("NCA") and NEPA, Failure to Address and Implement NCA Policies

Plaintiffs contend that Defendants have failed to adequately evaluate the noise impacts of the RBTI under federal, state, and local noise requirements and have failed to propose adequate mitigation plans to reduce or eliminate the threat to the health and welfare of the human environment which would be caused by the increased noise levels of the RBTI. Plaintiffs further complain that Defendants failed to consider alternative single event noise metrics—as compared to day/night noise averaging in urban communities—to evaluate the impact of aircraft noise on rural residents.

**Seventh:** Violation of NEPA, Inadequate Statement of Purpose and Need

Plaintiffs complain that Defendants have failed to adequately describe, establish, or justify how the proposed RBTI fulfills the purpose and need of airtime saved, numbers of sorties reduced, and cost reductions realized when compared to current training routes.

### E. Plaintiffs' Prayers for Relief

Plaintiffs seek judicial review of Defendants' FEIS, ROD, and RBTI, and ask this Court to order Defendants to prepare a more comprehensive programmatic EIS. Plaintiffs also ask this Court to order injunctive relief prohibiting the implementation of the expansion of military training activities and airspace approved by the RBTI and enjoining the expenditure of all federal funds mandated in connection therewith. Additionally, Plaintiffs seek issuance of Writs of Mandamus directing Defendants to comply with all common law and statutory obligations. Finally, Plaintiffs seek monetary, compensatory, and special damages, together with all costs of litigation.

### F. Defendants' Affirmative Answers

Defendants affirmatively answer that (1) all or part of Plaintiffs' Second Amended Complaint has failed to state a claim upon which relief can be granted; (2) this Court lacks jurisdiction over all or part of the subject matter of this action; (3) Plaintiffs lack standing to bring all or part of this

action; (4) Plaintiffs have failed to exhaust all administrative remedies; and (5) Plaintiffs' issues are not yet ripe for consideration by this Court or any other.

## II.

## PROCEDURAL BACKGROUND

### Pleadings

Plaintiffs' Complaint was filed on November 14, 2000; First Amended Complaint on March 16, 2001; and Second Amended Complaint on June 8, 2001. Defendants filed their respective Answers on December 21, 2000; March 28, 2001; and June 25, 2001.

### Motion to Dismiss

Defendants filed a Motion to Dismiss Complaint in Part and Brief in Support Thereof on September 6, 2001. Plaintiffs' Response to Defendants' Motion to Dismiss Complaint in Part was filed on October 2, 2001. Defendants' Reply to Plaintiffs' Response to Motion to Dismiss Complaint in Part was filed October 19, 2001. On December 19, 2001, this Court granted Defendants' Motion to Dismiss Complaint in Part and dismissed Plaintiffs' Eighth, Ninth, Tenth, and Eleventh Claims for Relief, leaving undisturbed Plaintiffs' First through Seventh Claims for Relief.

### Administrative Record

On June 29, 2001, Defendants lodged with the Court eighteen (18) volumes, 12,-904 pages, comprising the final administrative record ("AR").

On November 16, 2001, this Court entered an Agreed Order Supplementing Administrative Record and Designating Joint Administrative Record. The Agreed Order ordered that the AR, which was filed in the instant cause of action on June 29, 2001, together with any supplementation thereto permitted by this Court, shall also serve as the AR in *Davis Mountains Trans Pecos Heritage Association v. United States Air Force*, 249 F.Supp.2d 763 (N.D.Tex.2003). The Agreed Order also allowed Defendants to supplement the AR with Exhibits A through Q.

On November 21, 2001, this Court granted Plaintiffs' Unopposed Motion to Reconsider Motion to Supplement the Record. Defendants' Opposition to Plaintiffs' Motion to Supplement was filed on December 14, 2001. This Court's Order granting in part and denying in part Plaintiffs' Motion to Supplement the Administrative Record was filed on April 1, 2002.

Defendants' Notice of Filing Supplemental Materials to Administrative Record and Brief in Support Thereof was filed on July 19, 2002. Plaintiffs' Motion to Unfile "Defendants' Notice of Filing Supplemental Materials to Administrative Record and Brief in Support Thereof" and to Require Filing of Declaration of Non–Existence of Responsive Documents was filed on August 13, 2002. Defendants' Response to Plaintiffs' Motion to Unfile "Defendants' Notice of Filing Supplemental Materials to Administrative Record and Brief in Support Thereof" and to Require Filing of Declaration of Non–Existence of Responsive Documents was filed on August 21, 2002; and Plaintiff's Reply in Support of Plaintiffs' Motion to Unfile "Defendants' Notice of Filing Supplemental Materials to Administrative Record and Brief in Support Thereof" and to Require Filing of Declaration of Non–Existence of Responsive Documents was filed on September 5, 2002. This Court's Order denying Plaintiffs' Motion to Unfile "Defendants' Notice of Filing Supplemental Materials to Administrative Record and Brief in Support Thereof" and to Require Filing of Declaration of Non–Existence of Responsive Documents was filed on September 11, 2002.

Ultimately, the AR and supplements before this Court consisted of twenty-three (23) volumes, 15,950 pages.

### Summary Judgment

On January 14, 2002, this Court entered an Agreed Order Granting Plaintiffs' Agreed Motion to Enlarge Time to Submit Summary Judgment Briefs. Plaintiffs' Motion for Summary Judgment was filed on September 17, 2002. Defendants' Response to Plaintiffs' Motion for Summary Judgment was filed on November 15, 2002. Plaintiffs' Reply in Support of Motion for Summary Judgment was filed on December 18, 2002.

Defendants' Motion to Strike Extra–Record Declarations and Materials Attached to Plaintiffs' Motion for Summary Judgment was filed on November 15, 2002. Plaintiffs' Response to Defendants' Motion to Strike Extra–Record Declarations and Materials Attached to Plaintiffs' Motion for Summary Judgment was filed on December 18, 2002. Defendants filed no reply.

Plaintiffs' Motion to Strike Defendants' Declarations was filed on December 18, 2002. Defendants' Response to Plaintiffs' Motion to Strike Defendants' Declarations was filed on January 15, 2003. Plaintiffs' Reply in Support of Plaintiffs' Motion to Strike Defendants' Declarations was filed on January 30, 2003.

The Brief of *Amicus Curiae* The State of Texas was filed on September 23, 2002. Defendants' Response to State of Texas' *Amicus Curiae* Brief and Brief in Support was filed on November 18, 2002.

Defendants' Cross–Motion for Summary Judgment was filed on November 15, 2002. Plaintiffs' Response to Defendants' Cross–Motion for Summary Judgment was untimely filed on December 18, 2002. Defendants filed no reply.

### Oral Arguments

This Court's Order Setting Hearing to entertain oral arguments on January 29, 2003, specifically limited to (1) the appropriate baseline and (2) alternate basing was filed January 2, 2003.

## III.

## STANDARD

Ordinarily, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue as to any material fact." FED.R.CIV.P. 56(c). However, when reviewing the decision of an administrative agency, "a motion for summary judgment 'stands in a somewhat unusual light, in that the administrative record provides the complete factual predicate for the court's review.'" *Tex. Comm. on Natural Res. v. Van Winkle*, 197 F.Supp.2d 586, 595 (N.D.Tex.2002) (quoting *Piedmont Envtl. Council v. United States DOT*, 159 F.Supp.2d 260, 268 (W.D.Va.2001), *aff'd in relevant part by* 58 Fed.Appx. 20 (4th Cir.2003) (per curiam)).

"Summary judgment is an appropriate procedure for resolving a challenge to a federal agency's administrative decision when review is based upon the administrative record ..., even though the Court does not employ the standard of review set forth in Rule 56, Fed.R.Civ.P." *Id.* (quoting *Fund for Animals v. Babbitt*, 903 F.Supp. 96, 105 (D.D.C.1995)). In reviewing administrative agency decisions, the district court must determine whether, as a matter of law, evidence in the AR permitted the agency to make the decision it did, and "summary judgment is an appropriate mechanism for deciding the legal question of whether an agency could reasonably have found the facts as it did."

*Id.* (quoting *Sierra Club v. Dombeck,* 161 F.Supp.2d 1052, 1064 (D.Ariz.2001)). "Judicial review has the function of determining whether the administrative action is consistent with the law—that and no more." *Girling Health Care, Inc. v. Shalala,* 85 F.3d 211, 215 (5th Cir.1996) (citations omitted).

█ The standard for summary judgment on judicial review of agency decisions is not whether there is a genuine issue of material fact but "whether the agency action was arbitrary, capricious, an abuse of discretion, not in accordance with law, or unsupported by substantial evidence on the record taken as a whole." *Envt. Now! v. Espy,* 877 F.Supp. 1397, 1421 (E.D.Cal. 1994) (citing *Good Samaritan Hosp., Corvallis v. Mathews,* 609 F.2d 949, 951 (9th Cir.1979)). Thus, the issue is not whether material facts are disputed but whether the agency properly dealt with the facts. *Lodge Tower Condo. Ass'n v. Lodge Props., Inc.,* 880 F.Supp. 1370, 1376–77 (D.Colo.1995). The "court must find that the evidence before the agency provided a rational and ample basis for its decision." *Id.* at 1377 (quoting *Northwest Motorcycle Ass'n v. United States Dep't of Agric.,* 18 F.3d 1468, 1471 (9th Cir.1994)).

█ The narrow scope of the court's review is to determine whether the agency decision "was based on a consideration of the relevant factors and whether there has been a clear error of judgment," not to weigh the evidence pro and con. *Delta Found., Inc. v. United States,* 303 F.3d 551, 563 (5th Cir.2002) (quoting *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)). "Thus, if the agency considers the factors and articulates a rational relationship between the facts found and the choice made, its decision is not arbitrary and capricious." *Id.* (quoting *Harris v.*

*United States,* 19 F.3d 1090, 1096 (5th Cir.1994)). The "agency's decision need not be ideal, so long as the agency gave at least minimal consideration to relevant facts contained in the record." *Id.* (quoting *Harris,* 19 F.3d at 1096).

## IV.

## DISCUSSION

Plaintiffs allege that Defendants violated NEPA and the NCA by adopting an FEIS that (a) failed to take a hard look at the adverse consequences the RBTI would have on the quality of both human and wildlife environments; (b) negligently or deliberately misrepresented, distorted, or undervalued comments, records, studies, and other documents used to formulate the FEIS; (c) failed to prepare a programmatic EIS which considered the quantitative adverse consequences and cumulative environmental harm of the RBTI's full range of airspace proposals; (d) failed to consider other reasonable alternatives; (e) failed to adequately analyze the noise impacts of the RBTI; failed to propose adequate mitigation plans to reduce or eliminate the adverse impacts of the increased noise levels of the RBTI; and failed to consider alternative single event noise metrics, rather than day/night noise averaging in urban communities, when evaluating the impact of the aircraft noise on rural residents; and, finally, (f) failed to adequately describe, establish, or justify how the proposed RBTI fulfills the need and purpose of air time saved, numbers of sorties reduced, and cost reductions realized when compared to current training routes.

Plaintiffs seek judicial review of Defendants' final decision to approve the modification and expansion of the existing MTRs and the establishment of the Lancer MOA pursuant to the FEIS and ROD, which Plaintiffs allege were adopted by Defen-

dants in violation of NEPA, the NCA, and the Federal Aviation Act ("FAA").

***Judicial Review***

NEPA was enacted to establish a national policy "to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; to enrich the understanding of the ecological systems and natural resources important to the Nation; and to establish a Council on Environmental Quality ['CEQ']." 42 U.S.C. § 4321, *et seq.* (1994).[1] In order to achieve these substantive goals, NEPA requires compliance with certain procedures before and during the undertaking of any project that affects the environment. *See* NEPA § 4332. *See also Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 350, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989) (explaining that NEPA's goals are achieved through "action-forcing" procedures which do not mandate particular results, but "simply prescribe[ ] the necessary process"). Thus, "[i]f the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs." *Robertson,* 490 U.S. at 350, 109 S.Ct. 1835.

Under NEPA, adequate identification and evaluation of the adverse environmental effects of the proposed action require an agency to take a hard look at the environmental consequences of its actions, which includes a detailed EIS on

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

NEPA § 4332(2)(C). *See also* 40 C.F.R. § 1500, *et seq.* (2002) (setting forth the CEQ regulations expanding upon the appropriate form and content of an EIS).

■ An EIS is intended to provide decisionmakers "with sufficiently detailed information to aid in determining whether to proceed with the action in light of its environmental consequences and to provide the public with information and an opportunity to participate in the information gathering process." *Northwest Res. Info. Ctr., Inc. v. Nat'l Marine Fisheries Serv.,* 56 F.3d 1060, 1064 (9th Cir.1995). The EIS "insures the integrity of the agency process by forcing it to face those stubborn, difficult-to-answer objections without ignoring them or sweeping them under the rug and serves as an environmental full disclosure so that the public can weigh a project's benefits against its environmental costs." *Nat'l Audubon Soc'y v. Hoffman,* 132 F.3d 7, 12 (2d Cir.1997) (quoting *Sierra Club v. United States Army Corps of Eng'rs,* 772 F.2d 1043, 1049 (2d Cir.1985)) (internal quotations omitted).

■ However, because NEPA does not contain provisions to determine whether agency action complies with NEPA's necessary processes, compliance with NEPA is reviewed under the APA, 5 U.S.C. § 500, *et seq.* (1996).[2] *See Sierra Club v. Penfold,* 857 F.2d 1307, 1315 (9th Cir.1988) (concluding that "NEPA itself authorizes

1. Hereinafter cited as "NEPA § ..."

2. Hereinafter cited as "APA § ..."

no private right of action, ... [b]ut the APA provides for judicial review of agency action" under § 702 of the APA). Judicial review of agency action under the APA requires a "thorough, probing, in-depth review" of the AR to determine "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *ITT Fed. Servs. Corp. v. United States*, 45 Fed. Cl. 174, 184 (Fed.Cl.1999).

The APA provides the following scope of judicial review:

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial *de novo* by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

APA § 706.

Because NEPA "exists to ensure a process, not a result," *Mississippi River Basin Alliance v. Westphal*, 230 F.3d 170, 175 (5th Cir.2000) (quoting *Morongo Band of Mission Indians v. FAA*, 161 F.3d 569, 575 (9th Cir.1998)), "the variability of this procedural requirement has produced grossly general and conflicting judicial pronouncements." *Trans–Am. Van Serv., Inc. v. United States*, 421 F.Supp. 308, 318 (N.D.Tex.1976). Consequently, a number of courts began to expand the definition of the "whole record" before the court, but at the same time candidly recognized the narrow scope of review. *Pub. Power Council v. Johnson*, 674 F.2d 791, 793 (9th Cir. 1982). *See also County of Suffolk v. Sec'y of Interior*, 562 F.2d 1368, 1384 (2d Cir. 1977) (acknowledging the rule of limited record review, then recognizing that the focus of judicial inquiry is not necessarily restricted to the administrative record). Indeed, the United States Supreme Court has long held that expansion of the AR is appropriate when the record submitted fails to explain the basis for the agency's action, thereby frustrating judicial review. *Camp v. Pitts*, 411 U.S. 138, 142–43, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973).

■ Thus, the AR may be "supplemented, if necessary, by affidavits, depositions, or other proof of an explanatory nature." *Arkla Exploration Co. v. Tex. Oil & Gas Corp.*, 734 F.2d 347, 357 (8th Cir.1984). "The new material, however, should be explanatory of the decisionmakers' action at the time it occurred. No new rationalizations for the agency's decision should be included." *Sierra Club v. Marsh*, 976 F.2d 763, 772–73 (1st Cir.1992).

■ When adverse impacts are set forth in great detail in extra-record written submissions, "the court properly can consider this record in determining whether there exists a rational basis for the [agency] decision." *Exxon Corp. v. Fed. Energy Admin.*, 398 F.Supp. 865, 874 (D.D.C. 1975). *But cf. Smith v. FTC*, 403 F.Supp. 1000, 1008 (D.C.Del.1975) (holding that, because the scope of review of agency matters is confined to the administrative record, discovery in the form of depositions from agency officials was improper and irrelevant).

■ A court may also elect to allow extra-record evidence to determine whether an agency's final action meets the test of rationality under the following circumstances:

1. when agency action is not adequately explained in the record before the court;

2. when the agency failed to consider factors which are relevant to its final decision;

3. when an agency considered evidence which it failed to include in the record;

4. when a case is so complex that a court needs more evidence to enable it to understand the issues clearly;

5. in cases where evidence arising after the agency action shows whether the decision was correct or not;

6. in cases where agencies are sued for a failure to take action;

7. in cases arising under NEPA; and

8. in cases where relief is at issue, especially at the preliminary injunction stage.

*ITT Fed. Servs. Corp.*, 45 Fed. Cl. at 185. Thus, an adequate record can sometimes only be determined "by looking outside the [AR] to see what the agency may have ignored." *County of Suffolk*, 562 F.2d at 1384.

■ It is well established that "[t]he burden of proving that an agency decision was arbitrary or capricious generally rests with the party seeking to overturn the agency decision." *Van Winkle*, 197 F.Supp.2d at 596 (citing *Sierra Club v. Marita*, 46 F.3d 606, 619 (7th Cir.1995) and *N.C. Alliance for Transp. Reform v. United States DOT*, 151 F.Supp.2d 661, 679 (M.D.N.C.2001)). *See also Sierra Club v. Morton*, 510 F.2d 813, 818 (5th Cir.1975) (holding that plaintiffs bear the burden of showing by a preponderance of the evidence that defendants have failed to adhere to the requirements of NEPA).

■ In determining whether an agency's action was arbitrary or capricious, the court must consider "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judg[ ]ment." *Dombeck*, 161 F.Supp.2d at 1064 (quoting *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989)). The agency must examine the relevant data and articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962). However, "the Court is not allowed to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

■ It is also well established that a court may not set aside an agency's action based on the exercise of the agency's accumulated expertise merely because the court might reach a different result. *Simeon Mgmt. Corp. v. FTC*, 579 F.2d 1137, 1142 (9th Cir.1978). If the analysis of the

relevant documents "requires a high level of technical expertise, [courts] must defer to the informed discretion of the responsible federal agencies." *Or. Natural Res. Council*, 490 U.S. at 377, 109 S.Ct. 1851 (internal quotations omitted). Moreover, the Supreme Court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974).

The Supreme Court has cited the following nonexclusive examples of circumstances which would normally be considered arbitrary and capricious: (1) the agency relied on factors which Congress had not intended the agency to consider; (2) the agency entirely failed to consider an important aspect of the problem; (3) the agency offered an explanation for its decision that ran counter to the evidence before the agency; or (4) the agency's decision is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43, 103 S.Ct. 2856.

When reviewing challenges brought under APA § 706 regarding an agency's compliance with NEPA, the Fifth Circuit set forth the following three criteria for determining the adequacy of an EIS:

(1) whether the agency in good faith objectively has taken a hard look at the environmental consequences of a proposed action and alternatives;

(2) whether the EIS provides detail sufficient to allow those who did not participate in its preparation to understand and consider the pertinent environmental influences involved; and

(3) whether the EIS explanation of alternatives is sufficient to permit a

reasoned choice among different courses of action.

*Miss. River Basin Alliance*, 230 F.3d at 174.

Information satisfying these criteria must be in the EIS and the conclusions upon which the EIS is based must be supported by evidence contained in the AR. *Id.* at 174–75. "[T]he judicial concern is whether the [EIS] is a good faith, objective, and reasonable presentation of the subject areas mandated by NEPA[ ] and that the court should not second-guess the experts." *Manygoats v. Kleppe*, 558 F.2d 556, 560 (10th Cir.1977). A court "should intervene only when it is clearly determined that the agency's determinations were irrational or unreasonable." *ITT Fed. Servs. Corp.*, 45 Fed. Cl. at 184.

**A. Hard Look**

■ Plaintiffs allege that Defendants' FEIS failed to take a hard look at the adverse consequences the RBTI would have on both human and wildlife environments and that Defendants negligently or deliberately misrepresented, distorted, or undervalued comments, records, studies, and other documents used to formulate the FEIS.

First, Plaintiffs specifically complain that Defendants failed to adequately consider relevant information presented by the Heritage–Environmental Preservation Association, Inc. ("HEPA"). Plaintiffs fault Defendants for not including in the AR HEPA's voluminous information gleaned from numerous experts in relevant fields. Plaintiffs complain that Defendants' decision to include in the AR only the "cover letter" to HEPA's additional expert information deprived the RBTI decisionmaker from considering other significant information.

Second, Plaintiffs also complain that Defendants failed to adequately consider

comments authored by William J. Weida ("Weida"), Professor of Economics, regarding the RBTI's noise and route structures that were contained in the draft environmental impact statement ("DEIS"). Plaintiffs complain that the AR did not contain Weida's statement included in the HEPA appendix. Although Plaintiffs acknowledge that similar comments authored by Weida were contained in the AR, Plaintiffs argue that the format was so reduced in size that Weida's comments were nearly unreadable.

Defendants point out that HEPA's "cover letter," which summarizes HEPA's concerns with regard to the DEIS, is ninety-one pages in length and is included in the AR in its entirety. Defendants also point out that Weida's fifty-five page commentary, which was submitted directly by him and included in the AR, is nearly identical to that commentary which Plaintiffs assert was not included in the AR for consideration, notwithstanding any differences in pagination or format. Thus, Defendants argue that Plaintiffs have failed to demonstrate that Defendants did not adequately consider HEPA's and/or Weida's information. Rather, Defendants argue that inclusion in the AR of HEPA's ninety-one page overview of HEPA's concerns, as well as Weida's fifty-five page commentary submitted directly by him, placed before the decisionmaker information sufficient to take a hard look at the adverse environmental consequences of the RBTI as raised by HEPA and Weida.

### Judicial Determination

When NEPA was enacted, Congress did not require agencies to elevate environmental concerns over other appropriate considerations; rather, Congress required only that the agency take a hard look at the environmental consequences before taking a major action. *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council,*

*Inc.,* 462 U.S. 87, 97, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983).

██ This Court is, of course, mindful of the statutory requirement that the FEIS be a "detailed statement." NEPA § 4332(2)(C). "However, the Court must also avoid placing extreme or unrealistic burdens on the compiling agency." *Isle of Hope Historical Ass'n, Inc. v. United States Army Corps of Eng'rs,* 646 F.2d 215, 220 (5th Cir. Unit B 1981) (citing *Morton,* 510 F.2d at 819). An EIS "must be concise, clear, and to the point and written in plain language so that the public can easily understand it." *Van Winkle,* 197 F.Supp.2d at 600 (citing *Marita,* 46 F.3d at 619).

Compliance is to be judged against a "rule of reason." *Id.* In short, this Court must follow a pragmatic standard which requires good faith objectivity but avoids "fly specking." *Lathan v. Brinegar,* 506 F.2d 677, 693 (9th Cir.1974). Moreover, the CEQ regulations promulgated to help achieve the purposes of NEPA provide that "[a]ll substantive comments received on the draft statement (*or summaries thereof* where the response has been exceptionally voluminous), should be attached to the final statement whether or not the comment is thought to merit individual discussion by the agency in the text of the statement." 40 C.F.R. § 1503.4(5)(b) (emphasis added).

With the above criteria in mind, this Court is convinced that Defendants' decision to include in the AR Weida's fifty-five page commentary to the DEIS, which he submitted directly to Defendants, rather than the nearly identical comments of Weida offered by HEPA as an appendix, complies with the rule of reason and satisfies the goals of the APA and NEPA. This Court also finds that Defendants' pragmatic decision to utilize HEPA's ninety-one page summary "cover letter" entitled "Re-

sponse to [RBTI DEIS] March 1999," rather than the totality of the 698 pages offered by HEPA, was well within the strictures of the CEQ regulations and statutory mandates of NEPA.

In addition, "it is entirely unreasonable to think that Congress intended for an impact statement to document every particle of knowledge that an agency might compile in considering the proposed action." *Van Winkle*, 197 F.Supp.2d at 603 (quoting *Envtl. Def. Fund, Inc. v. Corps of Eng'rs of the United States Army*, 492 F.2d 1123, 1136 (5th Cir.1974)). "The detail required is that which is sufficient to enable those who did not have a part in [the EIS's] compilation to understand and consider meaningfully the factors involved." *Envtl. Def. Fund, Inc.*, 492 F.2d at 1136. *See also Sierra Club v. Watkins*, 808 F.Supp. 852, 862 (D.D.C.1991) (concluding that "NEPA does not require a federal agency to consider and discuss every viewpoint in the scientific community on a given matter").

This Court is persuaded, therefore, that HEPA's ninety-one-page "cover letter" and Weida's comments, submitted directly by him to Defendants, were adequately considered by Defendants, were properly included in the AR, were sufficiently detailed so that others could meaningfully consider the factors involved, and, when judged against the rule of reason, fully complied with the mandates of NEPA.

### B. Baseline

Plaintiffs claim that the FEIS (1) contains erroneous baseline information concerning current areas overflown; (2) presents conflicting information about the baseline year; (3) provides inconsistent sortie data; (4) contains the overinclusion of nonexistent operations; (5) provides conflicting information with regard to IR–102/141; (6) fails to include ATCAA infor-

mation; and (7) misrepresents aerial refueling data. Plaintiffs contend that Defendants' decision to approve the RBTI flies in the face of numerous inadequacies revealed in the baseline, noise analysis, and other related issues.

Plaintiffs specifically complain that Defendants' contention that Alternative B would include "about 15% new airspace" under IR–178 and "10 percent new airspace" under the Lancer MOA is contradicted by Defendants' December 1999 "Biological Evaluation" which states that about "33 percent of the airspace includes new areas not previously overflown by military aircraft or consulted on. This includes IR–178 segments...."

Plaintiffs also complain that Defendants failed to specifically define the baseline year and contend that the AR is silent as to how, why, or if the baseline year was changed from 1996 to 1997 or 1998.

Additionally, Plaintiffs fault Defendants for presenting inconsistent sortie operations data. Plaintiffs argue that Defendants' contradictions and inconsistencies regarding baseline figures necessarily render the FEIS materially flawed. Plaintiffs reason that if Defendants have misstated/overstated the baseline sortie operations, then any analysis of the various RBTI alternatives based on the baseline figures would likewise be dramatically altered.

For example, Plaintiffs argue that historically only seventy-five percent of the scheduled 1,560 baseline sortie operations under the No Action alternative have actually been flown. Thus, Plaintiffs contend that Defendants have significantly overstated the No Action baseline number. Consequently, Plaintiffs argue that Defendants' claim that the RBTI's 1,560 baseline sortie operations represent no change cannot be correct. Moreover, because the

FEIS repeatedly acknowledges that individuals residing under MTRs are accustomed to a certain amount of noise from established overflights, Plaintiffs argue that any FEIS noise analysis comparing the inflated No Action baseline numbers against the RBTI's baseline numbers must be faulty.

Plaintiffs also complain that Defendants erroneously included in the baseline current and "approved impending" activities which significantly inflated the baseline and which, in turn, artificially deflated the noise changes calculated in the DEIS and FEIS. Plaintiffs argue that because the baseline is intended to reflect the status quo, Defendants should not have included as part of the baseline any approved impending activities which reflected a projected status, not a current status.

Finally, Plaintiffs charge Defendants with completely omitting from the FEIS any environmental impact data with regard to aerial refueling. Plaintiffs argue that Defendants' knowing exclusion of any information related to aerial refueling skews the results of any relevant analyses or other adverse effects to the environment which should have been considered by the decisionmaker.

Defendants argue to the contrary that the FEIS clearly shows that the baseline (1) accurately reflects current airspace, (2) contains no conflicting information with regard to the baseline year, (3) reveals consistent sortie operations data, (4) does not include inapplicable nonexistent operations; (5) adequately analyzes the import of IR–102/141; (6) includes applicable AT-CAA information; and (7) properly omits a discussion on aerial refueling.

As to whether the AR accurately reflects the effects of flying activities in current airspace, Defendants specifically argue that Plaintiffs misapprehend the distinction between "frequency of use" of airspace and "management" of airspace. While Defendants acknowledge that Plaintiffs are correct that the FEIS indicates only three sorties per year on Reese 4 MOA and Reese 5 MOA, Defendants point out that each is defined as "primary" airspace, which consists of those MTRs and MOAs used by bombers from Barksdale AFB and Dyess AFB. In contrast, Defendants note that "secondary" airspace includes MTRs and MOAs that overlap or intersect with primary airspace but which are not used by Barksdale and Dyess AFBs.

Defendants argue, as a consequence, that even though changes in the *use* of training assets from year to year (depending upon the number of flying hours allocated, changes in training and tactics, mission deployments to other areas, and limitations in supplies and maintenance requirements) will inevitably cause variations in the *management* of the affected airspace, no measurable impacts on the economic value of the underlying land are expected as a result of the implementation of the RBTI, because the *frequency* of use remains the same due to the same baseline number of sorties. Rather, Defendants argue, because the affected airspace has generally been overflown since the 1940s, other factors, such as drought, market prices, community amenities, and proximity to urban areas, are more likely to affect land values than RBTI aircraft overflights. Thus, Defendants argue that due consideration was given to the baseline information about current areas overflown and that the analysis used to develop the baseline was reasonable.

As to the applicable baseline year, Defendants merely reference the FEIS, which consistently provides as follows:

*Actual Sortie–Operations Fiscal Year ("FY") 97:* Actual counts of aircraft activities based on scheduling and usage

information maintained by airspace managers formed the foundation for annual baseline sortie-operations.... Sortie-operations by all aircraft types ... documented as users of primary or secondary airspace are reflected in the FY 97 counts.

Defendants argue that had they wished to inflate the baseline figures to "dramatically alter[ ] the change in noise outcomes and other analyses" as alleged by Plaintiffs, then Defendants could easily have relied on FY 96 which reflected a baseline of 2,785 scheduled sorties on IR–178 *vis-à-vis* 1,560 baseline sortie operations listed for FY 97.

As to Plaintiffs' arguments alleging inconsistent sortie data, Defendants contend that the FEIS was compiled from various sources over the entire course of the multiyear NEPA process and included preliminary drafts and working documents, some of which necessarily changed over time. Defendants argue that the FEIS includes the best information reasonably available to Defendants and that the baseline numbers are in no way inflated or purposefully misleading. Moreover, Defendants argue that even if mistakes were made in the final compilation of the FEIS, such mistakes were without significance.

As to Plaintiffs' complaint that the FEIS included baseline figures not only for current activities but also for activities already approved or proposed to occur within the RBTI area, Defendants explain that NEPA requires that *all* proposed activities must be compared against the No Action alternative in order to analyze the differences that would be experienced within the affected airspace at the time of implementation of the pending activities. In addition, Defendants note that *each alternative* also included the proposed sortie operations. By accounting for all the contributing noise levels in all four alternatives, both including and excluding the pending activities for each alternative, Defendants argue that the process revealed not only the new noise levels in the affected airspace but also provided the across-the-board change to the baseline noise level for all alternatives.

As to Plaintiffs' complaint that the sortie operations figures for IR–102/141 reveal discrepancies in the AR, Defendants argue that Plaintiffs have selectively edited the numbers contained therein and have failed to identify the source of the data of which Plaintiffs complain. Defendants argue that even if Plaintiffs' complaints were accepted as accurate, Plaintiffs' own figures would represent a sortie operations increase discrepancy of only 2.4 percent over the entirety of IR–178. Even assuming, *arguendo*, that the 2.4 percent discrepancy is accurate, Defendants contend that Plaintiffs have failed to show that such a discrepancy would have had a significant impact on the materiality of the FEIS or the outcome of the implementation of the RBTI.

As to Plaintiffs' claims that the "Comparison of Existing and Proposed Area Under Alternative B: IR–178/Lancer MOA" fails to adequately analyze the use of the ATCAA above the Lancer MOA and consequently highlights the errors of the baseline, Defendants explain that what is being compared is the *footprint* of the ground underlying the airspace, not the upper limits of the airspace in the Lancer MOA area. Moreover, Defendants point out that the FEIS indicates that the proposed changes to IR–178/Lancer MOA/ATCAA would actually *reduce* the total amount of land under the airspace when compared to current conditions. Consequently, Defendants contend that Plaintiffs' argument is without merit.

Finally, as to Plaintiffs' complaint that Defendants completely omitted any discus-

sion of the effects of aerial refueling on any noise data related to the underlying land tracts, Defendants agree that Plaintiffs' statement is true. However, Defendants contend there is no significance to Plaintiffs' comments regarding this issue because aerial refueling tracks are defined as airspace normally at or above 20,000 MSL. Defendants argue that Plaintiffs cannot demonstrate any relevant adverse environmental noise impacts related to aerial refueling that should have been considered by the decisionmaker.

### *Judicial Determination*

The CEQ intended that agencies compare the potential impacts of a proposed major federal action to the known impacts of maintaining the status quo. *Ass'n of Pub. Agency Customers, Inc. v. Bonneville Power Admin.*, 126 F.3d 1158, 1188 (9th Cir.1997). In other words, requiring consideration of the No Action alternative constitutes use of the current level of activity as a benchmark. *See* Forty Most Asked Questions Concerning CEQ's [NEPA] Regulations, 46 Fed.Reg. 18,026 (Mar. 23, 1981). However, while informed and meaningful consideration of reasonable alternatives is an integral part of the statutory scheme, *Friends of Southeast's Future v. Morrison*, 153 F.3d 1059, 1065 (9th Cir.1998), this Court notes, and Plaintiffs specifically acknowledge, that "[a] baseline is not an independent legal requirement." 54 Fed.Reg. 23,756 (1989).

The Court also notes that even though NEPA is rigorous in its requirements, it does not require perfection or the impossible. *Envtl. Defense Fund v. Tenn. Valley Auth.*, 492 F.2d 466, 468 n. 1 (6th Cir.1974) (citations omitted). "[N]o matter how well the EIS has been written, someone later can always find fault with it." *Mason County Med. Ass'n v. Knebel*, 563 F.2d 256, 265 (6th Cir.1977). "This does not mean that every Environmental Assessment containing factual inaccuracies will have to be redone." *Van Abbema v. Fornell*, 807 F.2d 633, 643 (7th Cir.1986). Here, as in all proposed major federal actions, the EIS is intended to provide the decisionmaker "with sufficiently detailed information to aid in determining whether to proceed with the action in light of its environmental consequences and to provide the public with information and an opportunity to participate in the information gathering process." *Northwest Res. Info. Ctr., Inc.*, 56 F.3d at 1064.

With respect to Plaintiffs' claims that Defendants' artificially inflated baseline numbers skewed, *inter alia*, the outcomes of related noise analyses, this Court finds that Defendants' figures as to the scheduled and actual operations of the No Action alternative reasonably represented the status quo against which the remaining alternatives under the RBTI could be compared. This Court believes that the alleged disparity, if any, between the scheduled and actual sortie operations of Alternative A was not of such significance that the numbers misled the decisionmaker and/or the public when comparing the No Action alternative against the three remaining RBTI action alternatives under consideration.

With respect to Plaintiffs' contentions that the AR is unclear as to which year constitutes the baseline year for comparison of the No Action alternative against the remaining action alternatives under consideration, this Court finds that the AR reflects that both the DEIS and the FEIS consistently referenced FY 97 as the baseline year considered by the decisionmaker.

The DEIS states that the "[a]ctual count of aircraft activities based on scheduling and usage information maintained by airspace managers formed the foundation for annual baseline sortie-operations.... Sortie-operations by all aircraft types ... doc-

umented as users of primary or secondary airspace are reflected in the FY 97 counts." The FEIS also indicates: *"Actual Sortie–Operations Fiscal Year (FY) 97:* Actual counts of aircraft activities based on scheduling and usage information maintained by airspace managers formed the foundation for annual baseline sortie-operations."

Although the Court is cognizant that the AR originally indicated that FY 96 was the initial default baseline year during the early months of the evolutionary process necessary to complete the RBTI EIS, the Court nevertheless concludes that Defendants' change to the FY 97 baseline year was consistently reflected in the DEIS and conspicuously reflected thereafter in the FEIS.

Finally, with respect to Plaintiffs' arguments that Defendants' failure to (1) adequately assess the use of the ATCAA above the Lancer MOA and (2) include any analysis of the effects of aerial refueling distorted the accuracy of the relevant baseline numbers, this Court finds that Plaintiffs' claims are without merit.

First. The AR clearly reveals that a comparison of the existing and proposed areas under Alternative B were considered by Defendants. Indeed, the AR shows that although the proposed Lancer MOA/ATCAA would expand the upper and lower limits of the airspace in the RBTI area, the relevant footprint of the area underlying the Lancer MOA/ATCAA would actually be reduced when compared to current conditions.

Second. Defendants acknowledge that the FEIS omits any discussion of the effects of aerial refueling on the areas underlying the refueling tracks but contend that there is no significance regarding Plaintiffs' dispute as to this issue. This Court agrees.

The AR clearly defines aerial refueling tracks as "airspace of defined dimensions, vertical and lateral, established to conduct aerial refueling operations ... normally accomplished at or above 20,000 MSL." Plaintiffs have failed to show what, if any, adverse impacts of aerial refueling at that altitude should have been considered by the RBTI decisionmaker.

In order to assess Plaintiffs' complaints *vis-à-vis* Defendants' presentation of the various baseline operations information while adhering to a pragmatic standard which requires good faith objectivity but avoids "fly specking," *Lathan,* 506 F.2d at 693, this Court specifically considered the adequacy, practicability, and reasonableness of Defendants' baseline information and balanced Defendants' information against Plaintiffs' specific objections, as well as the broad purposes of NEPA. The Court also considered counsel's oral arguments presented on January 29, 2003, regarding the appropriate baseline.

While this Court is cognizant that Defendants have a duty to ensure the accuracy of the information placed before the decisionmaker, *Van Abbema,* 807 F.2d at 642, this Court is not convinced that Defendants were indifferent to the facts or that Defendants' presentation of the baseline information was conflicting, inconsistent, overinclusive, underinclusive, contradictory, arbitrary, capricious, and/or purposefully included inaccurate data. Even assuming, *arguendo,* that Plaintiffs' allegations with regard to any alleged discrepancies were true, Plaintiffs have failed to establish that such discrepancies would have materially affected the decisionmaker's evaluation of the RBTI. Therefore, this Court finds that Plaintiffs' allegations with respect to the AR's inadequate baseline must fail.

## C. Purpose/Need

The RBTI's purported purpose is to establish a set of linked training assets (1) to permit aircrews from Barksdale AFB, Louisiana, and Dyess AFB, Texas, to train for various missions while maximizing combat training time; (2) to provide linkage of airspace and other assets that support realistic training of bomber aircrews; and (3) to ensure flexibility and variability in the training of support bomber combat missions. Realistic, integrated training (a) ensures that bomber aircrews possess the skills and preparedness necessary for combat events, (b) links a realistic sequence of training activities into a cohesive mission, and (c) hones aircrew teamwork.

Defendants' alleged need for the RBTI is based on the current lack of terrain variability and linked systems of airspace and ground-based assets, the limited number of combat training flight hours available, and the disjointed and unrealistic combat training time necessitated by the current locations and arrangements of training assets.

Plaintiffs argue that Defendants' inaccurate assessment of its own data regarding training missions, the amount of flight time per mission, and the percentage of actual time spent on the training aspects of the flights nullifies the purported purpose and need for the RBTI. Plaintiffs complain that Defendants have failed to adequately describe, establish, or justify how the proposed RBTI fulfills the need and purpose of airtime saved, numbers of sorties reduced, and cost reductions realized when compared to current training routes.

Plaintiffs specifically assert that the No Action alternative indicates that a total sortie duration of 415 minutes, with total transit time of 155 minutes, allows sixty-three percent training time; while Alternative B is limited to fifty-five percent training time out of a total sortie duration of 310 minutes with total transit time of 139 minutes. Thus, Plaintiffs argue that selection of Alternative B does not meet the RBTI's purpose of maximizing training time but, rather, *reduces* the amount of training time realized.

Plaintiffs also complain that, contrary to the RBTI's stated purpose of minimizing inefficient training time, the FEIS indicates that the number of remote sorties will actually increase under the RBTI. Plaintiffs allege that the number of sorties to the Powder River MOA in South Dakota will increase by 76–95 sorties per year and that sorties to the Sevier, Utah, MOA will increase by 400–408 sorties per year. In addition, Plaintiffs claim that sorties to Granite Peak, Utah, and Belle Fourche, South Dakota, will increase by 343 and 127, respectively.

Plaintiffs argue that the Granite Peak ESS is only 496 nautical miles from Dyess AFB, *i.e.*, within the 600 nautical mile radius established by Defendants as the maximum distance for consideration as an action alternative. Yet, Plaintiffs complain that Defendants inexplicably misrepresented the Granite Peak ESS as a remote asset. Consequently, Plaintiffs argue that Defendants' failure to include the Granite Peak ESS as a viable alternative under the RBTI demonstrates Defendants' intention to misrepresent relevant information to the RBTI decisionmaker.

Finally, Plaintiffs contend that, as late as 1993, Defendants' environmental assessment for the construction of the ESS facilities at La Junta, Colorado, and Harrison, Arkansas, stated that La Junta and Harrison were considered "the only two facilities that could be used for this type of B–1 and B–52 training" and that "alternative locations have been evaluated and rejected due to requirements for additional airspace modifications' and failure to meet terrain

requirements." Plaintiffs claim that any allocation of additional expenditures for the RBTI ESS system would squander the significant expenditures already made for the La Junta and Harrison systems.

Defendants respond that integrating the bomber training flights to maximize combat training time via the RBTI ensures that aircrews are able to work together "as a team to perform the events and activities in sequence and with the speed and pace of combat." Defendants argue that not only was the purpose of and the need for the RBTI's integrated training specifically described during the public comment period, but the combat training tasks facing the RBTI crews were also fully described in the FEIS.

Defendants contend that calculation of the optimum average sortie duration resulted in a maximum radius per sortie of 600 nautical miles and that the alternatives considered under the RBTI were those training assets identified as within the 600 nautical mile radius from *each* of the bases. Defendants point out that although the Granite Peak ESS is within 600 nautical miles of Dyess AFB, its associated Sevier MOA is 770 nautical miles from Dyess AFB. Thus, Granite Peak was not considered an appropriate RBTI alternative.

Defendants further contend that "some continued use" of the remote ESS is implicit in the RBTI's stated need for "flexibility and variability in training to support bomber combat mission requirements." Defendants argue that such "variability in training" can only be attained through the continued limited use of Belle Fourche and Granite Peak.

Defendants explain that under the No Action alternative, Granite Peak hosted only 9.9 percent of the B–52 sortie operations and only 7.5 percent were conducted at Belle Fourche. Under Alternative B, although Defendants acknowledge that an increase to 10.1 percent of the B–52 sortie operations were projected for Granite Peak, Defendants point out that only a 5 percent increase was projected for Belle Fourche, thus maintaining the proportionate pre-RBTI use of the remote assets.

Finally, Defendants argue that Plaintiffs' references to the 1985 environmental assessment for La Junta and the 1993 environmental assessment for Harrison are irrelevant. First, Defendants assert that neither of the two sites was proposed or operated in conjunction with an associated MOA. Second, Defendants distinguish the La Junta environmental assessment, which says nothing about terrain requirements, from the Harrison environmental assessment, which states only that "[o]ther locations for the proposed action have been evaluated and rejected due to the requirement for significant airspace modifications, failure to meet terrain requirements, or excessive leasing costs."

Defendants argue that neither La Junta nor Harrison was developed for the type of integrated training proposed by the RBTI and that Defendants appropriately provided to the decisionmaker the financial impacts of decommissioning La Junta and Harrison. Consequently, Defendants contend that La Junta and Harrison were properly eliminated from consideration by Defendants as unreasonable alternatives. Defendants argue that Plaintiffs' assertion that either the public or the decisionmaker was misled is completely unfounded.

### Judicial Determination

"[T]he agency shall incorporate ... a concise general statement of ... basis and purpose." APA § 553(c). While the discretion afforded agencies to define the purpose and need of a project is not unlimited, courts have long "afforded agencies considerable discretion to define the

purpose and need of a project." *Friends of Southeast's Future*, 153 F.3d at 1066. However, "an agency may not define the objectives of its action in terms so unreasonably narrow that only one alternative from among the environmentally benign ones in the agency's power would accomplish the goals of the agency's action, and the EIS would become a foreordained formality." *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 196 (D.C.Cir. 1991). *See also City of New York v. United States DOT*, 715 F.2d 732, 743 (2d Cir.1983) (determining that "an agency will not be permitted to narrow the objective of its action artificially and thereby circumvent the requirement that relevant alternatives be considered"). An agency's statement of purpose and need is to be evaluated under a reasonableness standard. *City of Carmel–by–the–Sea v. United States DOT*, 123 F.3d 1142, 1155 (9th Cir.1997).

Applying a standard of reasonableness to Defendants' statement of purpose and need, this Court finds that Defendants' statement is clearly articulated and not unreasonable. Defendants' statement permitted an evaluation of a wide range of action alternatives in the EIS. For example, Defendants' alternatives allowed consideration of, *inter alia*, multiple training assets, variable terrain, integrated airspaces, cohesive mission sequences, and involvement in realistic, linked, and sequenced activities that equate to combat events.

This Court is persuaded that each of the action alternatives is reasonably consistent with the stated purpose and need of Defendants' proposed RBTI and each aims to meet Defendants' goal of maximizing combat training time. Plaintiffs have not established that Defendants' stated purpose and need is defined in such a way as to eliminate all but one alternative to accomplish the RBTI's goals.

Merely because, after consideration of the various alternatives, Alternative B was selected by the decisionmaker as best serving the overall purposes of the RBTI, it does not necessarily follow that the selection of Alternative B indicates that the purpose was defined too narrowly. Defendants' statement of purpose and need provided the decisionmaker and the public with information sufficient to permit their participation in the rule-making process under NEPA. Indeed, this Court finds that Defendants' statement of purpose and need encompassed broad objectives for the RBTI, did not artificially narrow the RBTI's objectives in an effort to define competing reasonable alternatives out of consideration, and adequately articulated reasonable and legitimate objectives to maximize combat training time with linked and integrated training assets. Therefore, this Court finds that Plaintiffs' objections to Defendants' statement of purpose and need must fail.

### D. Cumulative Impacts

Plaintiffs further challenge the adequacy of the FEIS as it addresses cumulative impacts. Plaintiffs argue that Defendants have failed to consider the "absolute quantitative" adverse consequences and cumulative environmental harm of the RBTI's full range of airspace proposals. Plaintiffs contend that Defendants have incorrectly treated all of the airspace modifications and expansions as discrete projects and/or programs subject to individual NEPA analysis.

Plaintiffs specifically argue that the RBTI is but one of a number of activities conducted by the Air Force in the RBTI multi-state geographic area. Plaintiffs argue that, because these multiple activities have significant overlapping impact on one

another, Defendants' cumulative effects analysis is insufficient. Plaintiffs insist that Defendants be required to prepare a regional programmatic EIS.

In the alternative, even if a regional programmatic EIS is found to be unnecessary, Plaintiffs argue that the FEIS otherwise failed to consider all the requisite cumulative effects of the RBTI. Plaintiffs contend that Defendants' FEIS failed to include a discussion of (1) the expansion and authorization of the Claiborne Range, Louisiana, Air Force Reserve B–52 "Inert Ordnance Training"; (2) the "Quadrennial Defense Review" actions; (3) the "Withdrawal Renewal for Fort Bliss, Texas"; and (4) state and local actions. Plaintiffs also claim that no mention was made of the cumulative effects of the programs at the White Sands Missile Range, the military actions occurring near Fort Bliss, and the nonmilitary actions near Holloman AFB.

Defendants argue that the RBTI's cumulative impacts were properly considered in the RBTI FEIS and that a regional programmatic EIS is not necessary. Defendants specifically contend that Plaintiffs have failed to identify any proposals that are directly linked to, or constitute a connected action of, the RBTI which would necessitate a programmatic EIS.

Defendants dispute Plaintiffs' contention that the July 1995 proposed changes in the force structure and related actions at Cannon AFB, New Mexico, were in any way directly linked to the proposed actions of the RBTI. Defendants argue that the 1995 modified defense orientation, which was accomplished by stationing fighter aircraft at Cannon AFB in response to worldwide events and changing global geopolitical situations, can only reasonably be considered entirely independent of a proposal to create realistic bomber training for aircraft at Barksdale and Dyess AFBs.

Defendants also dispute Plaintiffs' suggestion that (1) the pending conversion of six air launched cruise missile routes to MTRs and (2) the approval of the Talon MOA are directly linked to the RBTI.

Defendants argue that the proposed modifications to consolidate the six MTRs in southcentral New Mexico and southwestern Texas and convert them for use by manned fighter aircraft in low altitude training and to divide and modify the existing Talon MOA, which is located in New Mexico, for use in high-altitude and low-altitude air-to-air combat tactics training for fighter aircraft achieved an entirely different purpose with independent utility vis-à-vis the RBTI. Moreover, Defendants assert that both of these actions were fully addressed in the June 1999 final environmental assessment for the proposed airspace modifications supporting units at Hollomon AFB.

Defendants also take issue with Plaintiffs' assertion that the 1998 establishment of the Bronco MOA is so closely linked to the RBTI that a regional programmatic EIS is necessary. Defendants explain that, because the Bronco MOA involved raising the base of the MOA from 3,000 AGL to 8,000 MSL, the Bronco MOA qualified for a categorical exclusion under the regulations implementing NEPA and, thus, was not required to prepare an EIS.

Defendants deny that the 1998 training programs established for the Republic of Singapore at Cannon AFB, New Mexico, should be counted with those actions necessitating a programmatic analysis. Rather, Defendants claim that the proposed force structure and foreign military sales actions established a combined United States Air Force/Republic of Singapore squadron at Cannon AFB under the 27th Fighter Wing. Defendants assert that the new squadron, which consists of twelve F–16 aircraft and associated personnel, bears

no relationship to the RBTI and the training of bomber pilots from Barksdale and Dyess AFBs.

Further, Defendants dispute that the 1999 expansion of the German Air Force training activities at Holloman AFB, New Mexico, was sufficiently related to the RBTI to require a programmatic EIS. Although construction of a new target complex near Holloman AFB was required, Defendants argue that no changes in airspace use were proposed and, thus, no programmatic EIS was required.

Finally, with respect to the alleged need for a regional programmatic EIS, Defendants dispute that the 1997–2000 establishment of the 13th Bomb Squadron at Dyess AFB is directly linked to the RBTI. Defendants argue that the 13th Bomb Squadron action was entitled to a categorical exclusion, not only because the action related to the completely independent draw-down of fifteen KC–135Q aircraft, but because the related 1994 environmental assessment had previously reached a finding of no significant impact ("FONSI") with regard to the squadron action. Thus, Defendants contend that the RBTI has independent utility and is not a connected action triggering the need for a regional programmatic EIS.

As to Plaintiffs' claims that Defendants' cumulative effects analysis was insufficient, Defendants argue that the RBTI FEIS correctly identified (1) the area in which the RBTI's effects would be felt; (2) the RBTI's expected impacts in that area; (3) past, proposed, and reasonably foreseeable actions that have had or are expected to have impacts in the same area; (4) the impacts or expected impacts from these other actions; and (5) the expected overall impact from the potential accumulation of the individual impacts.

First. Defendants specifically argue that the FEIS repeatedly and graphically portrays the RBTI's overall study area. For example, Defendants contend that the FEIS describes, *inter alia*, the physiography, environment, people, traditional lifestyles and quality of life, and military airspace use associated with the RBTI.

Second. Defendants argue that the FEIS sets out in great detail the expected impacts of the RBTI on the affected areas, including airspace modifications, flight operations, construction, and ground operations, as well as the effects of decommissioning.

Third. Defendants contend that past, proposed, and reasonably foreseeable actions which might have resulted in cumulative effects in the RBTI were included in the FEIS. Defendants explain as follows:

Sortie operations of overlapping or intersecting airspace units with RBTI alternatives were added to obtain a combined total number of sortie operations. Past and present actions affecting the RBTI primary airspace were also included within the total use. In each relevant instance, the aircraft noise, air emissions, and aircraft safety rates were integrated with those generated by the RBTI components.

Fourth. Defendants argue that the FEIS fully describes the impacts associated with the RBTI and incorporates the impacts of known past and present actions in Defendants' discussion of the RBTI's cumulative effects. Defendants assert that the FEIS discusses each resource that could potentially be affected by the RBTI and includes details related to the affected environment for each alternative.

Fifth. Finally, Defendants contend that the FEIS fully summarizes the expected overall impacts from the potential accumulation of the individual impacts. Defendants assert that the FEIS addresses the impacts of the RBTI as to each alternative

and includes the environmental consequences on land management and use, biological resources, cultural resources, and soil and water resources.

As to Plaintiffs' complaints that certain specific actions were not discussed in the FEIS, Defendants point out that the B–52 "Inert Ordnance Training" involves the Air Force Reserve located in Louisiana, a site outside of the RBTI study area; Fort Bliss was established at El Paso, Texas, which is west of and outside of the RBTI study area; the White Sands Missile Range is north of El Paso and outside of the RBTI study area; and Holloman AFB is also north of El Paso and outside of the RBTI study area.

As to Plaintiffs' concerns that no state and local actions were included among the proposed and reasonably foreseeable activities that have had, or are expected to have, impacts in the RBTI area, Defendants call attention to their extensive scoping efforts and the fact that all relevant government agencies, public groups, and individuals were mailed copies of the DEIS, along with a request for comments. Defendants contend that all available public documents prepared by federal, state, and local agencies which identified reasonably foreseeable action were reviewed during the public participation process and that all concerned persons and agencies were contacted. Thus, Defendants argue that the AR amply demonstrates that the legal requirements under NEPA for adequate cumulative impacts analysis have been met.

### Judicial Determination

"Cumulative impact" is the "impact on the environment which results from the incremental impact of the [agency] action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other

actions." 40 C.F.R. § 1508.7. Cumulative impacts can result from "individually minor but collectively significant actions taking place over a period of time." *Id.* Specifically, the agency must consider connected actions, cumulative actions, similar actions, alternatives, and mitigation measures, as well as direct, indirect, and cumulative impacts. *Id.* § 1508.25.

The Fifth Circuit has determined that a meaningful cumulative effects study must identify the following:

(1) the area in which effects of the proposed project will be felt;

(2) the impacts that are expected in that area from the proposed project;

(3) other actions—past, proposed, and reasonably foreseeable—that have had or are expected to have impacts in the same area;

(4) the impacts or expected impacts from these other actions; and

(5) the overall impact that can be expected if the individual impacts are allowed to accumulate.

*Fritiofson v. Alexander,* 772 F.2d 1225, 1245 (5th Cir.1985).

But NEPA "places discernible limits on which projects must be considered together for their cumulative impact." *Clairton Sportsmen's Club v. Pa. Tpk. Comm'n,* 882 F.Supp. 455, 469 (W.D.Pa.1995). The need for a comprehensive environmental impact statement depends on the facts of each case, with the critical question being "whether actions are essentially independent or interdependent and whether each action involves an irretrievable commitment of resources." *Minn. Pub. Interest Research Group v. Butz,* 541 F.2d 1292, 1306 (8th Cir.1976); NEPA § 4332(2)(C)(v). Thus, when agency actions are independent, comprehensive cu-

mulative impact statements are not required.

Actions are "connected" if they (i) automatically trigger other actions which may require environmental impact statements; (ii) cannot or will not proceed unless other actions are taken previously or simultaneously; (iii) are interdependent parts of a larger action and depend on the larger action for their justification." 40 C.F.R. § 1508.25(a)(1).

For example, if the first phase in a multiphase project is independent of subsequent phases such that it would be rational to undertake the first phase without ever undertaking the subsequent phases, then the phases are not "connected." *Van Winkle,* 197 F.Supp.2d at 612 n. 34. *See also Hanly v. Kleindienst,* 471 F.2d 823, 830–31 (2d Cir.1972) (holding that an [EIS] should review the agency's proposed action in light of "the extent to which the action will cause adverse environmental effects in excess of those created by existing uses in the area affected by it," together with "the absolute quantitative adverse environmental effects of the action itself, including the cumulative harm that results from its contribution to existing adverse conditions or uses in the affected area"). *Accord Watkins,* 808 F.Supp. at 863 (quoting *Kleppe v. Sierra Club,* 427 U.S. 390, 410, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976)) (holding that "when several proposals for ... actions that will have cumulative or synergistic environmental impact upon a region are pending concurrently before an agency, their environmental consequences must be considered together").

The decision whether to prepare a programmatic EIS is a narrow one and is initially committed to agency discretion. *Id.* "[A]s long as the agency performs the necessary depth of analysis, the choice between a programmatic and a site-specific [EIS] is within the agency's discretion."

*United States v. 162.20 Acres of Land,* 733 F.2d 377, 381 (5th Cir.1984). Judicial review of an agency's decision not to prepare a programmatic EIS may only be overturned if the agency's decision was unreasonable. *Watkins,* 808 F.Supp. at 863.

Furthermore,

[n]othing in [NEPA] or the regulations implementing such law shall require the Secretary of Defense or the Secretary of a military department to prepare a programmatic, nation-wide environmental impact statement for low-level flight training as a precondition to the use by the Armed Forces of an airspace for the performance of low-level training flights.

Floyd D. Spence National Defense Authorization Act for Fiscal Year 2001, Pub.L. No. 106–398, § 1 [Div. A, Title III, Subtitle B, § 317], 114 Stat. 1654A–123 (2000).

Although this Court does not find the cumulative impacts analysis set forth in the AR a model of thoroughness and clarity, the FEIS lists anticipated sorties and time spent, applies the aircraft type and flying altitude data in evaluating the noise impacts; and explains why the number of sorties are reasonably considered the key component of the cumulative impact analysis. The FEIS further explains how the noise prediction methodology accounts for the RBTI activities in each area likely to be affected in a particular MOA or MTR and how the agency derived and applied a worst-case scenario based on the maximum number of aircraft operations within each region of influence. In addition, the AR makes clear that the RBTI was designed specifically to provide the necessary linked airspace training assets so that aircrews from Barksdale and Dyess AFBs could train for various missions while maximizing combat training time.

It appears clears to this Court that implementation of the RBTI was not depen-

dent on or related to the other programs complained of by Plaintiffs. Further, Plaintiffs cite no evidence of a clear nexus between the RBTI and other military airspace proposals across the region or nation that would automatically be triggered and require an EIS dependent on the RBTI's implementation.

In the absence of such evidence, it is not arbitrary and capricious to allow the RBTI to go forward independent of other current special use airspace designations or other current overlapping military flight training programs. Moreover, the fact that the RBTI involves some overlapping of airspace and related activities does not, in and of itself, require preparation of a regionwide EIS. *See Kleppe,* 427 U.S. at 412 n. 23, 96 S.Ct. 2718. Merely because the actions complained of by Plaintiffs may overlap some small portions of the same, airspace, the actions are independent of one another because the decision to proceed with any one action, or the RBTI, is not dependent on a similar decision for any of the other actions.

For these reasons, this Court finds that (1) the RBTI has independent utility and is not a connected action which would trigger the need for a programmatic regional or nationwide EIS analysis; (2) Defendants' cumulative impacts analysis provided sufficiently rigorous identification and consideration of the cumulative impacts of ongoing, proposed, and reasonably foreseeable future actions so as to allow appropriate public assessment; and (3) Defendants' cumulative impact analysis is legally sufficient and fulfills NEPA's requirements.

### E. Economic Analysis

Plaintiffs argue that NEPA requires Defendants to prepare an economic impact analysis to determine changes in the business activity, employment, income, and population of those local communities af-fected by the RBTI. Plaintiffs contend that Defendants' FEIS is particularly deficient in discussing economic data and fails to measure up to NEPA's purpose of addressing the social and economic requirements of present and future generations.

Plaintiffs complain that Defendants relied on an outdated economic impact study compiled in association with the establishment of the Valentine and Morenci MOAs in the 1980s. Plaintiffs point out that the 1980 study did not involve any of the low-level, subsonic, noisome, "startle-effect" overflights at issue under the RBTI. Rather, Plaintiffs argue that the 1980 study of the adverse effects of sonic booms is inapposite to the issues raised by the RBTI. Plaintiffs contend that the adverse impact of the RBTI low-level overflights on property values, hunting and fishing, general recreation and tourism, and human and animal well-being is significantly different than any adverse effects produced by sporadic sonic booms more than twenty years ago when the demography of the area was completely different.

Plaintiffs complain that the value loss to the properties underlying the military training corridors could range between $26–105/acre for recreational hunting and fishing leases, with additional value losses from reduced agricultural income and resale value. Plaintiffs argue that the RBTI noise impact alone decreases an underlying property's value at least nine to ten percent.

Finally, Plaintiffs accuse Defendants of (1) failing to confer with the local authorities of the City of Lubbock, Texas, regarding any inconsistencies between the RBTI and local policy, and (2) failing to adequately consider the adverse effects of the RBTI on flights into and out of Lubbock airports.

Thus, Plaintiffs argue that Defendants' assertion that "there is no evidence to

suggest military aircraft training, with or without supersonic operations, significantly or adversely affects the economic health of an area with respect to ranching, tourism, and recreation (including hunting), property value, development potential, or enjoyment of the land" is unsubstantiated. Indeed, Plaintiffs argue that NEPA places an affirmative duty on Defendants to develop new information which would reveal the RBTI's true environmental ramifications to the fullest extent possible.

To the contrary, Defendants argue that the socioeconomic analysis contained in the AR is sufficient. Defendants assert that the AR properly reflects mitigation measures adopted in conjunction with the RBTI, thus eliminating any significant increase in low-level overflights from current conditions and minimizing any adverse socioeconomic impact. In addition, Defendants note that the floor of the Lancer MOA is 3,000 feet AGL and that a large portion of the B–1 and B–52 annual sorties projected within the Lancer MOA will be conducted at altitudes above 15,000 feet AGL. Consequently, Defendants argue that the RBTI will cause little, if any, increase in the noise levels beneath the Lancer MOA and will not, as alleged by Plaintiffs, negatively affect the socioeconomic environment of the underlying areas.

Defendants also contend that the AR analyzes, at length, the economic benefits and costs tangential to the environmental consequences of the RBTI and that Defendants responded in detail to specific public comments concerning possible socioeconomic impacts of the RBTI. In addition to analyzing the obvious effects associated with the creation and loss of jobs, Defendants point out that the AR also specifically addresses the effects of the RBTI overflights on ranching, hunting, tourism, wildlife, property values, wage and employment data for the affected counties, and human and animal health. In addition, Defendants maintain that six overflights per day over the large RBTI MTR land area, as well as flights in the MOA at higher altitudes, will have no demonstrable effect on underlying land values. Consistent with the provisions of NEPA, Defendants claim that the AR adequately identifies those areas of socioeconomic concern and discusses all consequences not remote or highly speculative.

Defendants also contend that the socioeconomic impacts on Lubbock, Texas, were properly analyzed in conformance with NEPA's provisions. First, Defendants argue that both the state senator from Lubbock and the Lubbock airports were included on the RBTI notification mailing list throughout the EIS process. Second, Defendants contend that the FEIS reveals that the impacts of the RBTI on air traffic into and out of the Lubbock International Airport were reviewed by Defendants and presented to the decisionmaker. Third, Defendants argue that, because Lubbock is not located beneath either the Lancer MOA or MTR IR–178 and no direct effects on Lubbock's physical environment would occur, NEPA does not require a specific analysis of the socioeconomic effects alone. Fourth, Defendants mailed press releases to the Lubbock daily newspaper throughout the NEPA process.

Finally, Defendants contend that analysis of numerous studies by highly qualified and respected experts properly reflects the exhaustive lengths Defendants took to adequately consider the socioeconomic impacts of the RBTI. Defendants assert that Plaintiffs' attempts to second-guess Defendants' deliberative efforts by presenting conflicting opinions and arguments from Plaintiffs' own experts impermissibly suggest that this Court substitute its judgment in lieu of Defendants' expertise.

### Judicial Determination

Although CEQ regulations require agencies to ensure the professional and scientific integrity of environmental information and emphasize the need for multidisciplinary analysis, 40 C.F.R. §§ 1500.1(b) and 1502.24, "economic and social impacts clearly occupy a lesser tier of importance in an EIS than do purely environmental or ecological concerns." *Ass'n Concerned About Tomorrow, Inc. v. Dole*, 610 F.Supp. 1101, 1111 (N.D.Tex.1985).

Here, Plaintiffs argue that the socioeconomic analysis in the FEIS is inaccurate and/or incomplete and is in violation of NEPA. Plaintiffs claim that the adverse socioeconomic impact of the RBTI will be much greater than is identified in the FEIS.

However, this Court notes that the AR reveals that Defendants (1) relied on noise impact analyses to measure the impacts of the RBTI on residential and recreational land use; (2) utilized relevant population, housing, employment, and earnings data; and (3) discussed comparative residential valuation data and tourism earnings data in each region of influence. Because NEPA only requires a "reasonably thorough discussion that fosters informed decisionmaking, not a complete evaluation," *Stop H-3 Ass'n v. Dole*, 740 F.2d 1442, 1462 (9th Cir.1984) (internal quotations omitted), it appears to this Court that Defendants have more than met NEPA's requirements to discuss the relevant socioeconomic impacts of the RBTI.

In addition, the Fifth Circuit has long held that "[d]etermination of economic benefits and costs that are tangential to environmental consequences are within th[e] wide area of agency discretion." *S. La. Envtl. Council, Inc. v. Sand*, 629 F.2d 1005, 1011 (5th Cir.1980). NEPA requires, at most, "a narrowly focused, indirect review of the economic assumptions underlying a federal project described in an impact statement." *Id. See also Sierra Club v. Sigler*, 695 F.2d 957, 974–75 (5th Cir.1983) (finding that an agency need only consider "important" information relevant to a "significant" effect not based on "unreasonable speculation"); *Town of Norfolk v. United States EPA*, 761 F.Supp. 867, 887–88 (D.Mass.1991) (holding that the failure to place a dollar value on a possible decrease in property value was not unreasonable); *Izaak Walton League of Am. v. Marsh*, 655 F.2d 346, 377 (D.C.Cir.1981) (finding that, if adverse environmental impacts are unlikely and the EIS identifies areas of uncertainty, studies are not necessary and the agency has fulfilled its mission under NEPA); *Envtl. Defense Fund, Inc. v. Andrus*, 619 F.2d 1368, 1375 (10th Cir.1980) (concluding that NEPA does not contemplate detailed discussions of environmental effects which are deemed remote, which are only speculative possibilities, and which cannot be readily ascertained). Here, the Court finds that Defendants adequately identified and discussed all of the non-speculative socioeconomic impacts reasonably foreseeable and related to the RBTI.

In addition, because Defendants were entitled to rely on their own experts, so long as the experts' decisions were not arbitrary and capricious, "the mere presence of contradictory evidence does not invalidate the [a]gencies' actions or decisions." *Wyo. Farm Bureau Fed'n v. Babbitt*, 199 F.3d 1224, 1241 (10th Cir.2000). "[A]n agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Or. Natural Res. Council*, 490 U.S. at 378, 109 S.Ct. 1851. *See also Price Rd. Neighborhood Ass'n, Inc. v. United States DOT*, 113 F.3d 1505, 1511 (9th Cir.1997) (rejecting attempts to en-

gage in a battle of the experts); *Inland Empire Pub. Lands Council v. Schultz*, 992 F.2d 977, 981 (9th Cir.1993) (refusing to decide which experts had more merit). This Court is convinced that Defendants' level of expertise enabled Defendants to reasonably evaluate studies conducted by experts and to determine the applicability of such studies to different situations, including the RBTI.

Although this Court recognizes that Plaintiffs do not agree with Defendants' experts concerning the RBTI's potential socioeconomic impacts, this Court finds that Defendants' analysis adequately details the reasonably foreseeable economic impacts of the RBTI and that the FEIS is supported by evidence sufficient to foster informed public participation and reasoned decisionmaking. "NEPA does not require an agency to take the action that is the most compatible with [the] environment, nor does it permit a court to substitute its judgment for that of the agency on the wisdom of the action taken by the agency." *Sigler*, 695 F.2d at 977. Accordingly, this Court "will not displace the [agency's] choice between conflicting views." *Custer County Action Ass'n v. Garvey*, 256 F.3d 1024, 1039 (10th Cir.2001).

This Court is also persuaded that Lubbock, Texas, officials were fully apprised of Defendants' NEPA progress and, indeed, were invited by Defendants to participate in the EIS process. This Court also finds that the City of Lubbock, which is not located beneath either the Lancer MOA or MTR IR–178, will not suffer any direct physical environmental effect and, at most, only indirect socioeconomic effects. 'Consequently, this Court finds that Defendants were not required to further analyze the socioeconomic impacts in order to meet the requirements of NEPA. *See Image of Greater San Antonio v. Brown*, 570 F.2d 517, 522 (5th Cir.1978) (making clear that socioeconomic impacts alone, without a physical effect upon the environment, do not trigger the requirements to perform a NEPA analysis).

## F. Noise

Plaintiffs dispute at great length the inadequacy of the noise analysis contained in the FEIS. Initially, Plaintiffs assert that the FEIS employed a flawed methodology that resulted in severely understated noise impacts. Plaintiffs argue that the FEIS noise equivalents resulting from day/night averaging of noise impacts over a twenty-four-hour period ("Ldn") is inappropriate, especially given the rural areas affected by the RBTI. According to Plaintiffs, Defendants' use of the Ldn sound methodology does not accurately portray the actual noise impact on the underlying ranchlands and other particularly sensitive noise areas. According to Plaintiffs, using a sound averaging methodology such as Ldn does not account for the noise impact resulting from single noise events.

Instead, Plaintiffs claim that the FEIS analysis should have focused more on the noise impact of single, dramatic noise events by using the sound exposure level ("SEL") metric. Plaintiffs argue that the SEL metric measuring specific noise events, such as a single aircraft overflights and sudden onset of noise, would better reflect the RBTI aircrafts' true sound level and their potential to interfere with human activity.

Plaintiffs also argue that Defendants deliberately input the incorrect number of flying days into the calculations used to determine the Ldn. Because the Ldn model uses averaging, Plaintiffs complain that Defendants' use of 360 flying days/year, rather than 260 flying days/year as listed in the FEIS, necessarily dispersed the overflight noise over 360 days rather than

260 days and resulted in an artificially low Ldn.

Plaintiffs similarly criticize Defendants' (1) use of inaccurate sortie/year numbers; (2) failure to properly consider various aircraft speeds and multiple aircraft maneuvers; (3) failure to address the net effect of flight rescheduling to accommodate wildlife and biological concerns; (4) omission of noise impacts modeling in connection with the ATCAA above the Lancer MOA; (5) use of incorrect meteorological data; (6) calculations based on the uniform dispersion of flight patterns; (7) calculations based on the uniform dispersion of people living within the RBTI area; (8) failure to offer qualified expert justification for the noise analysis; (9) failure to prepare any noise analyses of the MTR underlying entry, reentry, and exit routes; (10) use of arbitrary ambient noise levels; (11) inconsistent baseline noise levels; and, finally, (12) reliance on the Schultz curve for estimating the numbers of people who are highly annoyed with various aircraft Ldn levels. Plaintiffs complain that each inaccuracy or omission listed above is fatal to Defendants' noise analysis in the FEIS.

Contrary to Plaintiffs' many assertions, Defendants argue that the FEIS addresses every essential fact necessary to predict the noise levels caused by the addition of the RBTI sorties when compared to the noise levels associated with the baseline. Indeed, Defendants argue that the Ldn cumulative metric accounts for the maximum noise levels, the duration of the noise events, the number of events over each twenty-four hours, and any adjustments necessary for nighttime noise events and the startle effect. Defendants argue that not only was the RBTI's noise analysis accomplished by using the methodology most widely employed by multiple federal agencies, but the Ldn methodology has frequently been approved by the courts to measure noise in a variety of settings.

In addition, Defendants argue that the FEIS accurately sets out the parameters for the MTR/MOA noise maps, including, *inter alia*, location, aircraft types, altitude distribution by aircraft type, numbers of sortie operations, airspeeds, and power settings. Defendants also point out that the FEIS noise analysis accurately accounts for all sortie operations using a thirty-day monthly measure and that all the data needed to run the noise model were contained in the FEIS and were readily accessible to the decisionmaker.

Defendants acknowledge that the MTR/MOA noise maps do not address sortie operations at altitudes greater than 18,000 feet AGL above the ATCAA, but Defendants note that the total number of proposed sortie operations was not concomitantly reduced either, thus compressing more flight activity into a lesser amount of airspace than would actually be used. Consequently, Defendants contend that Plaintiffs' allegations that the noise levels would have shown an increase if Defendant had spread the flight activity within the larger airspace is simply, and arithmetically, incorrect. Defendants also maintain that the noise map developers and noise model technicians were clearly identified in the FEIS and the decisionmaker was free to invalidate the sources and the results of the noise modeling if the decisionmaker so desired.

Finally, Defendants insist that no potential for concentration of activity exists at entry, reentry, and exit points on IR–178; that Plaintiffs cannot point to a single adverse effect stemming from ambient noise levels less than 45 dB; that the FEIS responded to specific public comments concerning sleep studies; and that Plaintiffs' experts' complaints about Defendants' use of the Schultz curve were rejected by De-

fendants in favor of their own qualified experts.

### Judicial Determination

When the NCA was enacted, Congress declared that it was the policy of the United States to promote an environment for all Americans free from noise that jeopardizes health or welfare. 42 U.S.C. § 4901, et seq. (1995).[3] Consequently, Defendants are specifically subject to an "environmental impact analysis process" ("EIAP") which provides that aircraft noise data files used for analysis during EIAP must be reviewed and validated prior to public release. 32 C.F.R. § 989.32. In addition, Defendants must "[u]tilize the current NOISEMAP computer program for air installations ... for [MTRs] and [MOAs]." Id.

Here, the FEIS included a discussion of the concept of natural quiet as a resource, additional information concerning the relative noise impacts in rural settings, and maps displaying noise contours for airspace impacted by the RBTI. Defendants presented information breaking down the noise levels above 65 dB, a level acknowledged to significantly disturb outdoor speech; above 75 dB, a level acknowledged to produce significant disturbances; and higher dB known to likely cause persons to be "highly annoyed." Defendants also discussed the possible interference with speech, sleep, and land use, plus the potential for adverse effects on wildlife.

The conclusions reached in the FEIS are based on the data gathered by, and the reasoned opinions of, recognized experts. As stated supra, "agencies are entitled to rely on their own experts so long as their decisions are not arbitrary and capricious." Colo. Envtl. Coalition v. Dombeck, 185 F.3d 1162, 1173 n. 12 (10th Cir.1999). See also City of Bridgeton v. FAA, 212 F.3d

448, 459 (8th Cir.2000) (recognizing that "[t]he agency, not a reviewing court, 'is entrusted with the responsibility of considering the various modes of scientific evaluation and theory and choosing the one appropriate for the given circumstances'") (quoting Sierra Club v. United States DOT, 753 F.2d 120, 129 (D.C.Cir.1985)). See also United States Air Tour Ass'n v. FAA, 298 F.3d 997, 1009 (D.C.Cir.2002), petition for cert. filed sub nom. AirStar Helicopters, Inc. v. FAA, 71 U.S.L.W. 3430, 2003 WL 1903730 (U.S. Dec. 13, 2002) (No. 02–931) (agreeing that "[w]hen specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts") (quoting Or. Natural Res. Council, 490 U.S. at 378, 109 S.Ct. 1851).

This Court appreciates Plaintiffs' concerns over the differing scientific opinions and conclusions over noise impacts; and this Court does not ignore the fact that contradictory evidence and data may well exist. However, "the mere presence of contradictory evidence does not invalidate the [a]gencies' actions or decisions." Wyo. Farm Bureau Fed'n, 199 F.3d at 1241. Even if this Court were to have made a different choice had the matter been before the Court de novo, this Court cannot displace the agencies' choice between two conflicting views. Arapahoe County Pub. Airport Auth. v. FAA, 242 F.3d 1213, 1218 (10th Cir.2001). As a general matter, this Court must "defer to [Defendants'] reasonable exercise of its judgment and technical expertise" in the area of aircraft noise. United States Air Tour Ass'n, 298 F.3d at 1008.

Although Defendants are required to "explain the assumptions and methodology used," it is generally accepted that the scientific nature of a noise model "does not

---

**3.** Hereinafter cited as "NCA § ..."

easily lend itself to judicial review," and this Court's review must proceed "with considerable deference to [Defendants'] expertise." *Id.* "The principal question ... is whether [Defendants'] explanation of the [noise] model's assumptions and methodology is reasonable." *Id. See also Van Winkle,* 197 F.Supp.2d at 600 (determining that "the role of this Court is to determine whether Defendants' implementation of their methodology had a rational basis that was consistently applied").

"Courts have consistently held that the choice of scientific methodology used in an EIS is within the sound discretion of the agency." *Citizens Concerned About Jet Noise, Inc. v. Dalton,* 48 F.Supp.2d 582, 596 (E.D.Va.1999). Indeed, "numerous courts have approved the use of the exact sound methodology used in this case, while rejecting the exact argument that plaintiff makes here." *Id.* (approving the use of Ldn methodology and rejecting the argument that the FAA was required to consider single-event noise levels). *See also Communities, Inc. v. Busey,* 956 F.2d 619, 623 (6th Cir.1992) (holding that there was no requirement that the FAA go beyond the Ldn cumulative noise impact methodology); *Valley Citizens for a Safe Env't v. Aldridge,* 886 F.2d 458, 468–69 (1st Cir. 1989) (acknowledging that the Ldn methodology is the standard methodology used by all federal agencies); *Sierra Club,* 753 F.2d at 128 (rejecting the argument that the failure to use single event noise analysis instead of, or in addition to, cumulative noise methodology was unreasonable).

Here, it is clear to this Court that the FEIS demonstrates that the noise effects of the RBTI were, in fact, analyzed in considerable detail using not only the Ldn sound methodology, but also comparison studies using the SEL metric system. Not only is the choice of noise analysis methodology left to the discretion of De-

fendants, but this Court must also defer to Defendants' reasonable exercise of its judgment and technical expertise in the area of aircraft noise. This Court is persuaded that Defendants' decision to use the standard Ldn noise methodology was reasonable and is convinced that the FEIS more than adequately informed the decisionmaker of the potential adverse noise consequences to the environment which could result from implementation of the RBTI.

After thoroughly reviewing the AR, this Court concludes that Plaintiffs have failed to show that Defendants' noise analysis was in any way inadequate or deficient. Plaintiffs' objections do not demonstrate that the FEIS's noise impact analysis was (1) unsupported by substantial evidence in the AR, (2) inadequate to foster informed public participation and decisionmaking, or (3) otherwise arbitrary and capricious. This claim, therefore, provides no basis for setting aside the FEIS.

## G. Alternatives

Plaintiffs challenge the alternatives analysis on a number of specific grounds. Plaintiffs claim that Defendants considered only three alternatives in addition to the statutorily mandated No Action alternative and failed to consider moving the RBTI bombers to alternate basing at Belle Fourche, South Dakota, or Granite Peak, Utah. Plaintiffs claim that use of these alternate bases would increase the percentage of flight time spent training when compared against the percentage of flight time spent training under the RBTI.

Plaintiffs argue that Defendants' primary reason for not considering alternate basing, *i.e.,* congressional authorization would be required, does not constitute an excuse for completely dismissing the alternatives from consideration. Thus, Plaintiffs argue that Defendants' FEIS fails to

meet NEPA regulations which require that agencies evaluate *all* reasonable alternatives, including those not within the jurisdiction of the lead agency.

Plaintiffs also argue that Defendants' FEIS did not consider three additional electronic combat range ("ECR") sites which the AR shows that B–1s and B–52s could use, *viz.*, (1) Saylor Creek Range, Idaho, (2) Poinsette Range, South Carolina, and (3) Melrose Range, New Mexico. In addition, Plaintiffs complain that Defendants did not consider cooperative arrangements to share ESS or other similar ranges or sites with other Department of Defense facilities outside the Air Force. Finally, Plaintiffs contend that the RBTI FEIS did not consider other action alternatives which might have fulfilled some, but not all, of Defendants' RBTI needs but with less adverse environmental impact. As a result, Plaintiffs argue that the RBTI FEIS is inadequate because Defendants failed to take a hard look at all reasonable alternatives to the proposed action.

To the contrary, Defendants argue that alternate basing was, in fact, fully considered but was found to be unreasonable. Although Defendants acknowledge that the Belle Fourche and Granite Peak sites offer high-quality, realistic, integrated training, Defendants point out that the two sites have no associated ESS assets within the 600 nautical mile radius considered optimum for RBTI average sortie duration. Defendants assert that such unreasonably long transit times contribute little to combat training and do not efficiently use valuable flight training time. Defendants assert that implementation of alternate basing at either site was deemed too remote and speculative and, thus, the sites were not considered as possible alternatives to the RBTI. Therefore, Defendants excluded Belle Fourche and Granite Peak from consideration.

Defendants also dispute Plaintiffs' contention that the ECR sites in Idaho, South Carolina, and New Mexico were completely omitted from the FEIS. Defendants argue that the AR reflects that each site was considered as an alternative, but "due to distance, scheduling, airspace altitude limitations, or less than optimal equipment, these three ECRs are not adequate to maintain aircrew combat readiness." Defendants assert that their consideration of possible alternatives for the RBTI was reasonable, was not arbitrary and capricious, and fulfilled the mandates required by NEPA.

### Judicial Determination

The regulations governing an agency's consideration of "[a]lternatives including the proposed action" provide that

> [t]his section is the heart of the [EIS]. Based on the information and analysis presented in the sections on the Affected Environment (§ 1502.15) and the Environmental Consequences (§ 1502.16), it should present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public. In this section agencies shall:
>
> (a) Rigorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated.
>
> (b) Devote substantial treatment to each alternative considered in detail including the proposed action so that reviewers may evaluate their comparative merits.
>
> (c) Include reasonable alternatives not within the jurisdiction of the lead agency.

(d) Include the alternative of no action.

(e) Identify the agency's preferred alternative or alternatives, if one or more exists, in the draft statement and identify such alternative in the final statement unless another law prohibits the expression of such a preference.

(f) Include appropriate mitigation measures not already included in the proposed action or alternatives.

40 C.F.R. § 1502.14.

■ "'Reasonable alternatives' are those that meet the underlying purpose and need for the proposed action and that would cause a reasonable person to inquire further before choosing a particular course of action." 32 C.F.R. § 989.8(b). Thus, the FEIS must provide "a basis for (a) evaluation of the benefits of the proposed project in light of its environmental risks, and (b) comparison of the net balance for the proposed project with the environmental risks presented by alternative courses of action." *Natural Res. Def. Council, Inc. v. Morton,* 458 F.2d 827, 833 (D.C.Cir. 1972). However, while discussions as to reasonable alternatives do not require "crystal ball" inquiry, it is nevertheless inappropriate to disregard alternatives merely because they do not offer a complete solution to the problem. *Id.* at 837.

■ In like manner, "[t]he mere fact that an alternative requires legislative implementation does not automatically establish it as beyond the domain of what is required for discussion, particularly since NEPA was intended to provide a basis for consideration and choice by the decision-makers in the legislative as well as the executive branch." *Id.* However, "[w]e do not suppose Congress intended an agency to devote itself to extended discussion of the environmental impact of alternatives so remote from reality as to depend on, say, the repeal of the antitrust laws." *Id.*

"The Air Force need not analyze highly speculative alternatives, such as those requiring a major, unlikely change in law or governmental policy." 32 C.F.R. § 989.8(b). "[Defendants] may expressly eliminate alternatives from detailed analysis, based on reasonable selection standards (for example, *operational ...*)" (emphasis added). *Id.* § 989.8(c).

Although Defendants acknowledged in response to public comments that Belle Fourche and Granite Peak are sites near ESS assets that might meet Defendants' RBTI training needs, Defendants eliminated Belle Fourche and Granite Peak as reasonable alternatives for the RBTI. In rejecting the two nearer sites, Defendants' RBTI FEIS states:

*Move Bombers:* Through public involvement, commentors [sic] suggested relocating the bombers from Barksdale and Dyess AFBs to other bases nearer to assets that might meet training needs. As noted in Chapter 1, only two ESS systems exist that might meet those needs: Belle Fourche in South Dakota and Granite Peak in Utah. Relocation of the bombers to bases near these ESS systems does not, however, represent a reasonable alternative. Congress and the President, through the Base Realignment and Closure process, made the decision to base additional bombers at Barksdale and Dyess AFBs. Shifting the bombers to a new location would require similar authorization or basing decisions outside the scope of this analysis.

Of course, this Court recognizes that an agency's discussion of environmental effects need not be exhaustive, but Defendants are required to present sufficient information to permit a reasoned choice of alternatives. *Natural Res. Def. Council, Inc.,* 458 F.2d at 836. "The existence of a viable but unexamined alternative renders

an environmental impact statement inadequate." *Simmons v. United States Army Corps of Eng'rs*, 120 F.3d 664, 670 (7th Cir.1997).

Here, the FEIS indicates that Defendants examined seventy-two routes within approximately 600 nautical miles of Dyess and Barksdale AFBs. Of those seventy-two routes, Defendants carried forward three action alternatives which met the 600 nautical mile radius limitation, the slope and terrain variability requirement, and the 50 nautical mile low-angle line-of-sight ESS accessibility.

Although coarse and fine screening by Defendants indicated that Alternatives B and C had approximately equal potential for being identified as the preferred operational alternative, subsequent input from the FAA indicated that the modification and increased use of the proposed Texon MOA/ATCAA within Alternative C(1) could significantly impair instrument flight rules ("IFR") traffic; (2) would require rigid management with little or no capability to support any flight changes or delayed operations; (3) would necessitate rerouting of civil and commercial aircraft using affected jet routes and federal airways; and (4) could possibly require restructuring of the airspace. Consequently, Defendants determined that the operational flexibility of Alternative C would be limited.

In contrast, Defendants' analysis of the proposed Lancer MOA/ATCAA indicated that action Alternative B offered considerable flexibility and was better suited to support the RBTI's training activities with less potential interference with other aviation in the area. The AR showed that the FAA indicated to Defendants that, although Alternative B might require rerouting of civil and commercial aircraft, the amount of traffic would be minimal, would be easily accommodated, and would allow less constrained flow into and out of the training airspace. Consequently, Defendants selected Alternative B as the preferred operational alternative.

The FEIS then indicates that Defendants conducted—independently of the preferred operational alternative—an evaluation of the three action alternatives to determine the environmentally preferred alternative. Coarse screening revealed that Alternatives B and C each had the potential for fewer and lower magnitude environmental impacts than Alternative D and each had equal potential for being the environmentally preferred alternative. Fine screening, however, indicated that Alternative B would necessitate substantially less new airspace than Alternative C and the number of cultural resources potentially affected by the construction of the threat emitter sites and ESS would be one fewer under Alternative B.

Although Defendants' fine screening of the environmental impacts revealed minor differences in the potential environmental consequences of Alternatives B and C, Alternative B did offer somewhat less potential for adverse environmental impacts, because, among other things, modification of the existing MOAs to form the Lancer MOA decreased the land area underneath by 801,501 acres. Thus, Alternative B was minimally preferable to Alternative C. However, when considered in conjunction with Alternative B's *operational* superiority, Defendants selected Alternative B as the RBTI's preferred action alternative.

With regard to the three ECR sites located in Idaho, South Carolina, and New Mexico, the AR indicates that B–1s and B–52s could use the sites; however, due to distance, scheduling, airspace altitude limitations, and/or less than optimal equipment, the three ECR sites were found to be inadequate to maintain aircrew combat readiness.

In the final analysis, NEPA's requirement with regard to an agency's consideration of alternatives is subject to a rule of reasonableness. The rule of reason "guides both the choice of alternatives as well as the extent to which the [EIS] must discuss each alternative." *Am. Rivers v. Fed. Energy Regulatory Comm'n*, 201 F.3d 1186, 1200 (9th Cir.1999) (quoting *City of Carmel–by–the–Sea*, 123 F.3d at 1155). Under the rule of reason, Defendants need not consider an infinite range of alternatives, only reasonable ones. 40 C.F.R. § 1502.14(a). NEPA "does not require agencies to analyze the environmental consequences of alternatives it has in good faith rejected as too remote, speculative, or … impractical or ineffective…. What is required is information sufficient to permit a reasoned choice of alternatives as far as environmental aspects are concerned." *Colo. Envtl. Coalition*, 185 F.3d at 1174 (quoting *All Indian Pueblo Council v. United States*, 975 F.2d 1437, 1444 (10th Cir.1992)).

▇▇▇ "An [EIS] may not be held insufficient by a court merely because the agency has failed to discuss in it every conceivable alternative to the proposed project." *Ass'n Concerned About Tomorrow, Inc. v. Slater*, 40 F.Supp.2d 823, 832 (N.D.Tex. 1998) (citing *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 554, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978)). NEPA requires only that reasonable alternatives be evaluated. NEPA § 4332(2)(C). Alternatives that do not accomplish the purpose of an action are not reasonable. *Colo. Envtl. Coalition*, 185 F.3d at 1174–75. *See also City of Bridgeton*, 212 F.3d at 456.

Applying the above criteria and the rule of reason to Plaintiffs' claims that Defendants considered an insufficient range of alternatives, as well as to the oral arguments presented by counsel regarding alternate basing, this Court first looked to the intended purpose of the RBTI. *See Colo. Envtl. Coalition*, 185 F.3d at 1174–75. The primary purpose of the RBTI is to establish linked training assets which maximize the realistic training time of combat bomber aircrews.

The FEIS specifically discusses the training criteria against which each alternative was evaluated and also explains that Alternatives A, C, and D were eliminated from further detailed consideration because those alternatives did not best satisfy the RBTI's integrated training requirements, *i.e.*, the very purpose of the RBTI. For those alternatives which Defendants eliminated, the EIS need only briefly discuss the reasons for the alternative having been eliminated. 40 C.F.R. § 1502.14(a). "[A]gencies must be free to make reasonable limitations on the scope of their discussions of such alternatives." *Slater*, 40 F.Supp.2d at 833.

Here, the FEIS demonstrates that Defendants compared the impacts of Alternative B with the impacts of continuing to fly in the existing, unchanged MTRs and MOAs, *i.e.*, the No Action alternative. This is all the law requires. 40 C.F.R. § 1502.14. To the extent that Plaintiffs complain of an insufficiency with regard to Defendants' consideration of the No Action alternative, this Court finds, consistent with its finding *supra* regarding the adequacy of Defendants' baseline, that Plaintiffs' claims must fail under the rule of reason.

This Court also finds that the AR sets forth reasonable training criteria for the RBTI and that the AR demonstrates that Defendants sufficiently (1) defined the objectives of the RBTI; (2) identified alternatives that would accomplish those objectives; and (3) took a hard, comparative look at the environmental impacts associated with each reasonable alterna-

tive, including the No Action alternative. Consequently, this Court finds that the alternatives were presented in sufficient detail and were supported by the balance of the AR and that Defendants adequately assessed the probable environmental impact so as to comply with NEPA. Thus, Plaintiffs' challenge to the adequacy of the alternatives analysis fails.

### H. Impact on Underlying Ranchland

Plaintiffs maintain that Defendants have failed to adequately analyze the RBTI's impacts on the unique recreational ranchland underlying or immediately adjacent to the RBTI and have failed to consider the potential lost revenue caused by the RBTI's impacts on cattle and horse ranching, farming, and public and private hunting, fishing, and camping. Plaintiffs express concern with regard to the potential impacts of the RBTI on these sensitive areas and criticize the FEIS for not fully analyzing those impacts.

Specifically, Plaintiffs complain that Defendants did not adequately assess the significant adverse impacts which could result from the startle effects of the low-level overflights on the livestock below. Plaintiffs contend that animals subjected to the sudden onset of high-speed aircraft noise experience an increase in spontaneous abortion rates, a decrease in milk and meat production, a decrease in egg-laying rates, and an overall increase in animal injury and mortality rates.

Plaintiffs also complain that Defendants did not conduct an economic analysis of the effects of the low-level flights on the value of underlying lands leased for hunting and other recreational purposes. Plaintiffs cite statistics, gleaned from the AR, which indicate that hunters, fishermen, horseback riders, and other recreationists are annoyed by the aircraft noise from the low-level overflights. In addi-

tion, Plaintiffs complain that the analysis contained within the AR is inadequate with regard to the adverse effects on migratory birds, including snow geese, green-wing teal, pintail, widgeon, and long-billed dowitchers; predatory birds, including *aplomado* falcons and bald eagles; wolves; rodents; and ungulates.

Finally, Plaintiffs argue that Defendants' purposeful elimination of many overflights over Big Bend National Park is the best evidence of the significance of the adverse effects of the RBTI overflights. Plaintiffs contend that Defendants' intentional modification of IR–178 to eliminate airspace over Big Bend National Park is an implicit acknowledgment that the overflights are disruptive annoyances. Plaintiffs claim that Defendants merely shifted the burden of the effects of the overflights from federal land to private landowners.

In response, Defendants argue that over a dozen studies included in the AR address the effects of low-level overflights on livestock underlying the RBTI. Although the analyses at times reach contradictory conclusions, and Defendants candidly acknowledge that injuries to startled animals are possible, Defendants contend, on balance, that the weight of the studies indicates that livestock adapt to and habituate to various sound sources, including jet aircraft noise. Defendants also point out that the AR provides information concerning the claims process in the event livestock is, in fact, injured. Contrary to Plaintiffs' assertions, Defendants argue that the AR thoroughly analyzes the potential impacts of overflights on livestock and allows an informed and reasoned decision.

Defendants echo the above arguments with respect to the extensive discussion in the AR devoted to the effects of the RBTI on biological resources. Defendants argue that the impacts of the RBTI on recreation, hunting, and numerous bird and ani-

mal species were addressed in detail in both the FEIS and in response to public comments. Defendants argue that Plaintiffs' insistence that an economic study be conducted of the hunting and recreational revenue generated and/or lost on account of the RBTI is misplaced. Because NEPA does not require a contemporary study before making an administrative decision, and because Defendants used the best information available under the circumstances, Defendants argue that no obligation to conduct a contemporary study existed. Furthermore, Defendants contend that NEPA does not require the FEIS to analyze every study on every species of every bird or animal and reconcile the differences in order to meet NEPA's purpose.

Finally, Defendants question Plaintiffs' pointed criticism of Defendants' voluntary reduction of the numbers of special land use areas to be overflown. Defendants argue that the proposed modification represents a reduction of overflights of special land use areas when compared to the No Action alternative. Defendants also note that a total of only 16 nautical miles will be overflown under Alternative B and, of this distance, one-third is within the Chinati Mountain Property, which is inaccessible to the public. Defendants argue that Plaintiffs' critiques are wholly unfounded.

### Judicial Determination

This Court begins by noting that NEPA requires only that agencies make a reasonable, good faith effort to analyze environmental impacts. "[I]t is entirely unreasonable to think that Congress intended for an impact statement to document every particle of knowledge that an agency might compile in considering the proposed action." *Envtl. Def. Fund, Inc.*, 492 F.2d at 1136. This Court also notes that, although NEPA requires agencies to consider and respond to the comments and con-

cerns expressed by the public and other federal agencies, NEPA does not require that those agencies necessarily agree. 40 C.F.R. § 1503.1.

In this case, the AR verifies that Defendants identified possible noise impacts on sensitive areas, including the effects of overflights on beef cattle, dairy cows, sheep, pigs, horses, mink, dogs, chickens, turkeys, migratory birds, predatory birds, and other wildlife within the RBTI area. The AR also indicates that Defendants amply considered the concerns expressed by the public and other agencies; and Defendants candidly acknowledged that adverse impacts were possible but reasonably determined, after considering public and agency comment alike, that any additional impact on these areas would be minimal. Further, the AR indicates that the RBTI adopted specific measures to mitigate possible impacts on sensitive areas, such as raising minimum flying altitudes and minimizing numbers of special use land areas overflown, as well as providing information to the public concerning the claims process if livestock should be injured.

While Plaintiffs are certainly entitled to disagree with Defendants' conclusions, this Court finds that the AR belies Plaintiffs' allegations that Defendants ignored or otherwise failed to consider the adverse effects on the underlying ranchland. Indeed, nearly all of Plaintiffs' complaints with regard to Defendants' inadequate analysis of the adverse effects of the RBTI on the underlying ranchland cites *Defendants'* statistics contained in the AR.

Although Plaintiffs disagree with Defendants' conclusions regarding the information contained in the AR, it is obvious that Defendants did, in fact, consider the issues raised and did place before the final decisionmaker adequate information from which to make an informed decision. This

Court also notes that Defendants candidly acknowledged the potential adverse effects of the RBTI on the underlying area. NEPA requires nothing more. Therefore, this Court finds that Defendants took a hard look at the environmental consequences of the RBTI on the underlying ranchland within the affected area and upholds the FEIS as sufficient to permit a reasoned choice by the decisionmaker.

### I.  Bird Strikes

Plaintiffs argue that the AR presents incomplete and/or conflicting information with regard to Alternative B's interference with major migration flyways or water bodies where birds congregate. Plaintiffs accuse Defendants of purposefully excluding from the AR the bird/aircraft strike avoidance plan for Dyess and Barksdale AFBs and of using false and/or incomplete parameters for the "Bird Air–Strike Hazard" ("BASH") model used to estimate the potential of bird strikes. Without complete and correct documentation, Plaintiffs argue that the final decisionmaker would be unable to make a reasoned assessment of Defendants' choice of Alternative B.

Defendants argue that decades of studies of bird migrations, bird flight patterns, and past bird strikes have been used to develop a "Bird Avoidance Model" which defines altitudes and locations to avoid. In addition, Defendants claim that historical models of bird strikes within a specific MTR or MOA also provide indicators of the potential for bird-aircraft strikes. While Defendants acknowledge that there are birds in and beneath the affected airspace and that bird-aircraft strikes do occur, Defendants insist, based on eleven years of bird strike data on MTRs in the RBTI area, that a hard look at the issue of aircraft safety *vis-à-vis* bird strikes revealed that bird-aircraft strikes were not a significant problem.

### Judicial Determination

Contrary to Plaintiffs' assertions that Defendants failed to consider the potential of bird strike hazards or used false and/or inaccurate parameters for Defendants' BASH model, a review of the AR demonstrates that Defendants devoted considerable attention to the safety issues involved in connection with the avoidance of bird-aircraft strikes.

Specifically, the AR reveals that aircrews are alerted through "Special Operating Procedures" to the increase of migratory waterfowl throughout the RBTI routes, especially during the spring and fall migration seasons, and aircrews are advised to make seasonal adjustments as necessary to minimize bird-aircraft strikes. In addition, maps contained within the AR depict the playa lakes and wetlands within the RBTI which might or might not attract migratory birds.

The AR also sets forth BASH data compiled by Defendants which identifies all reported bird-aircraft strikes between 1985–1996. Additionally, the FEIS states that ninety-five percent of all bird-aircraft strikes occur below 3,000 feet AGL, while the *floor* of the Lancer MOA starts at 3,000 AGL. Finally, the FEIS indicates that B–1s and B–52s historically strike only eight to ten birds annually on the six primary MTRs within the RBTI, including IR–178.

It appears completely reasonable to this Court that Defendants would conclude that bird-aircraft strikes would not be a significant problem should the RBTI be implemented. Therefore, this Court finds that Plaintiffs have failed to prove that the FEIS was inadequate with respect to bird-aircraft strikes or that the decisionmaker did not have the information necessary to make an informed decision.

## J. Impact on Human Health

Plaintiffs fault Defendants for not completely and adequately addressing the human health impacts of the RBTI, including hearing loss and damage, loss of sleep, physical and mental health, and adverse effects on children.

Plaintiffs complain that Defendants ignored studies relevant to the deteriorating effects of subsonic low-level flights on the inner ear. Plaintiffs also dispute Defendants' assertion that practicably attained Ldn measurements of 65 dB protect those most impacted by noise. Rather, Plaintiffs argue that the Environmental Protection Agency ("EPA") recommends an Ldn of 55 dB to protect the public health and welfare with an adequate margin of safety. Plaintiffs assert that greater Ldn levels can result in significant sleep disturbances, hypertension, heart disease, stroke, ulcers, and other digestive disorders adversely affecting the health and well-being of Plaintiffs. Finally, Plaintiffs contend that children can suffer from sleep disturbance, speech interference, hearing threshold shifts, and lowered academic achievement.

In response, Defendants point out that the EPA's recommended 55 dB level is the threshold for defining noise impacts in urban *residential* areas, not sparsely populated ranchland. Moreover, Defendants note that the EPA specifically cautions that the recommended 55 dB level was developed without concern for economic or technological feasibility, was intentionally conservative in order to protect the most sensitive portion of the population, and also included an additional margin of safety.

In addition, Defendants argue that their experts concluded, based on the minimum altitude of 500 feet and the few flights having a maximum sound levels approaching 118 dB, that "it is unlikely that the noise from the training and low-altitude flight areas considered in [the RBTI] would increase [the] risk of hearing loss, even in small children." In addition, Defendants contend that the results of Defendants' worst-case scenario study, in which human subjects were exposed to eight separate 130 dB overflights separated by only ninety seconds, indicated that "the probability of noise induced hearing loss must be very small." Further, Defendants point out that the land use compatibility guidelines of the United States Department of Housing and Urban Development indicate that all land uses under IR–178 and the Lancer MOA are compatible with an Ldn of 65 dB, including agriculture, livestock farming and breeding, recreational activities, and parklands. Regardless, when faced with conflicting views, Defendants argue that they have the discretion to rely on the reasonable opinions of their own qualified experts.

With regard to sleep interference, Defendants acknowledge that aircraft overflights can cause noise-related awakenings. However, Defendants contend that (1) only fifteen to twenty percent of the MTR sorties would be conducted at night, only five percent of the total number of sorties would occur in the lowest altitude band, and, because the MTR is up to fourteen miles wide, the number of direct overflights above any single point would be minimal; and (2) under the Lancer MOA, only an average of nine sorties/day will be flown, at altitudes above 3000 feet AGL, over an area of more than 3,000 square nautical miles.

Finally, Defendants point out that Plaintiffs' complaints with regard to the effects of the RBTI's proposed overflights on physical health, mental health, and adverse effects on children merely take issue with the studies Defendants included in the AR. Thus, contrary to Plaintiffs' assertions that Defendants ignored the RBTI's possible

health effects, the information contained in the studies was at all times available to the decisionmaker as part of the reasoned decision process. Moreover, Defendants assert that the proposed Ldn under the Lancer MOA will only be 46 dB and under IR–178 will only be 59 dB or less and that Plaintiffs cite no studies indicating adverse health effects from such low exposure levels.

### Judicial Determination

This Court's thorough review of the AR demonstrates that each and every concern expressed by Plaintiffs with regard to the health effects associated with the RBTI was specifically addressed by Defendants. First, Defendants candidly acknowledged that noise is the most common complaint associated with aircraft operations and readily conceded that certain persons would be "highly annoyed." Second, Defendants included in the AR numerous studies which analyzed the impacts of noise on the human environment, including the physical and mental health of adults and children. Third, the AR reflects Defendants' awareness of the conflicting opinions of recognized experts and the need to address many factors to determine the potential impacts of aircraft noise, including the number and timing of overflights and the vertical and horizontal dispersion of flights.

This Court is persuaded that Defendants (1) forthrightly addressed the issues relevant to the potential adverse health impacts of the RBTI; (2) presented reasonably detailed information on the subject areas at issue; (3) included evidence in the AR to support Defendants' conclusions for consideration by the final decisionmaker; (4) provided the public with information and an opportunity to participate in the NEPA process regarding the health impact issues; and (5) justifiably relied on their own experts regarding the interpretation of the conflicting noise data found in the studies.

This Court is convinced that Defendants' decision was based on a consideration of relevant factors, that there has been no clear error of judgment, and that a rational basis exists for the conclusions approved by the decision. Accordingly, this Court will "not substitute its judgment on such matters for that of the agency." *ITT Fed. Servs. Corp.*, 45 Fed. Cl. at 184. This Court finds that Plaintiffs have failed to meet their burden of showing that Defendants' actions were arbitrary and capricious or otherwise not in conformance with the law.

### K. Historic Property

Plaintiffs complain that Defendants failed to adequately address concerns regarding structural damage to historic properties caused by acoustic vibrations. Plaintiffs contend that empirical evidence indicates that structural damage will occur to low-rise, flat-roofed adobe constructions typical of the historic structures within the RBTI area. Plaintiffs insist that additional planning is required to avoid routes that might incur greater structural damage, such as cracking of walls and foundations.

In response, Defendants assert that background information on archaeological and architectural resources within the RBTI was researched through (1) on-ground surveys of all ESS and threat emitter sites; (2) the database of the National Register of Historic Places; and (3) records searches of the New Mexico Historic Preservation Division, the Texas Archaeological Research Laboratory, and the Colorado Historical Society. Although Defendants acknowledge that damages caused by acoustic vibrations are more difficult to evaluate, Defendants' studies concluded that subsonic noise-related damage to

structures is unlikely, even at decibel levels of 120 dB to 130 dB.

### Judicial Determination

Defendants once again justifiably rely on the body of information contained in the AR to refute Plaintiffs' allegations. Defendants fully recognized that any assessment of noise exposure levels should consider noise-induced secondary vibrations damage. To that end, the AR reveals that Defendants considered the potential effects of noise on various cultural resources, including petroglyph sites, pueblos, ruins, historic districts, courthouses, schools, government and public buildings, houses, mansions, cabins, farms, ranches, barns, windmills, hotels, stores, mills, and other commercial buildings. In addition, this Court is of the opinion that Plaintiffs' particular concern with regard to adobe buildings appears to be ill-founded, because studies contained in the AR indicate that the probability of damage to an adobe wall from an overflight of a B-1 at 200 feet AGL—an altitude not contemplated in the RBTI—is .000005%.

This Court is convinced that Defendants adequately considered the relevant research and data in this area and provided detail sufficient to permit a reasoned choice among different courses of action. In addition, Defendants readily acknowledged that acoustical vibration damage could occur, provided information about the types of damage that might be suffered, and provided information about filing compensation claims for damages associated with aircraft overflights. NEPA requires nothing more.

This Court finds that Defendants adequately considered the potential adverse environmental impacts which might result from acoustical vibrations caused by low-level overflights and placed before the final decisionmaker information in sufficient detail to make a reasoned decision. There-

fore, this Court finds that Defendants' discussion with regard to the likelihood of structural damage to cultural resources underlying the RBTI adequately complied with NEPA's mandates.

### L. Hazardous Materials, Civil Aviation

Plaintiffs complain that Defendants' attempts to minimize the significant public health, safety, and environmental concerns of hazardous materials and waste transportation do not constitute a hard look as intended by NEPA. Plaintiffs assert that Defendants' blasé dismissal of such safety concerns is inappropriate when Defendants themselves admit that the risk of low-level flying is very high and that fifty-seven percent of all aircrew fatalities occur during low-altitude maneuvering. At the very least, Plaintiffs argue that Defendants should not have ignored the potential safety issues which could result from spilled aircraft fuel or mistakenly dropped ordnance.

Plaintiffs also contend that Defendants' perfunctory discussion of other civil aviation issues is deficient. Plaintiffs point out that Defendants failed to set forth any management and coordination measures to accommodate the frequent civil aviation flights of ranchers, cloud seeding pilots, cropdusting pilots, and other local visual flight rules ("VFR") pilots.

Finally, Plaintiffs assert that Defendants do not discuss measures to counterbalance the fact that local airports within the RBTI area would not be able to use instrument approaches during times of MOA activity. Plaintiffs also express concern that Defendants do not address the resultant increased noise levels caused during busy flying periods which would concentrate sortie numbers in the Lancer MOA in an effort to accommodate operating hours which do not conflict with peak peri-

ods of arrival and departure of commercial traffic to and from the Dallas/Fort Worth and Houston airports.

Defendants first respond that minimal quantities of hazardous materials are used at the ESS and threat emitter sites and that all hazardous materials handling complies with Defendants' policies and procedures. In addition, Defendants assert that adherence to proper storage and use of hazardous materials is ensured through Defendants' Environmental Compliance Assessment Management Program, which requires internal audits, as well as examinations by independent reviewers.

Defendants acknowledge, however, that secondary effects from aircraft crashes, such as fire and environmental contamination, could occur, but such secondary effects would be situationally dependent and difficult to quantify. In any event, Defendants argue that such uncertainty should not render Defendants' FEIS deficient.

Defendants also point out substantive discussions contained in the EIS regarding aircraft emissions for each of the alternatives considered under the RBTI. Defendants argue that the pollution studies show that, although emissions from military aircraft would increase slightly in Alternative B, such emissions would be highly dispersed, would not noticeably degrade air quality, and would contribute only fractions of the allowable amounts set forth under federal standards.

As to Plaintiffs' criticism with regard to the impact of the RBTI's increased airspace on civil aviation during peak and non-peak times, Defendants point out that Plaintiffs neglected to consider the substantial additional information provided in response to concerns expressed during the scoping process. Defendants argue that considerable detail was added regarding the nature, speed, and duration of flight activities, as well as measures to mitigate impacts on civil aviation, and that such data was more than sufficient to permit a reasoned choice among different courses of action.

### Judicial Determination

This Court's review of the AR and FEIS shows that Defendants adopted several mitigation measures which specifically addressed concerns voiced by the public and also addressed the potential for conflicts with civil aviation in the RBTI area. Proactive solutions were adopted by Defendants (1) to establish the floor of the Lancer MOA above the minimum altitudes for all airports under or adjacent to the MOA; (2) to establish a military radar unit to allow easier access and real-time communications to avoid potential conflicts between military and general aviation aircraft in local airspace; and (3) to increase communications with local aviators via a toll-free number with airspace schedule information. Finally, although Defendants admitted that environmental damage could occur should an aircraft crash spill fuel, the AR's studies reveal that aircraft accidents have steadily declined every year since 1947 and any adverse effects are expected to be minimal.

Even were that not so, uncertainty as to environmental consequences need not bar action as long as the uncertainty is forthrightly considered in the decisionmaking process and disclosed in the EIS. *Izaak Walton League of Am.*, 655 F.2d at 377. *See also Sigler*, 695 F.2d at 970 (finding that where the cost of uncertainty has been considered and the responsible decisionmaker has decided that the uncertainty is outweighed by the benefits of proceeding with the project, the courts may not substitute their judgment for that of the decisionmaker and insist that the project be delayed while more information is sought).

The Court also finds that Plaintiffs' speculation that increased noise levels might result from changing the MOA boundaries to accommodate the busy times of the Dallas/Fort Worth and Houston airports was adequately addressed by Defendants in the context of the RBTI's noise analysis discussed *supra,* especially in light of Defendants' discussion related to the Ldn cumulative methodology which accounts for a twenty-four-hour period of time. In addition, this Court notes that the AR incorporates numerous "Special Operating Procedures" relevant to MTR IR–178. These "Special Operating Procedures" direct aircraft to avoid additional noise sensitive areas, including residences, towns, private airstrips, and municipal airports. Consequently, Plaintiffs have failed to show that Defendants' consideration of the possible adverse environmental effects of hazardous materials and local civil aviation issues did not allow a reasoned choice among different courses of action.

### M. Mitigation

Plaintiffs next attack the proposed mitigation measures adopted by Defendants as not constituting mitigation at all; rather, Plaintiffs complain that the FEIS was simply overreaching since its inception. Specifically, Plaintiffs claim that Defendants' suggested mitigation measure to raise the 200 foot AGL floor of some segments of IR–178 to a 300 foot AGL floor with regard to "all segments of IR–178" effectively *lowers* the floor of those IR–178 segments that were otherwise greater than 300 feet AGL.

Defendants counter by citing the AR verbatim, as follows:

> The public expressed concerns that the floor of *some segments* of the proposed IR–178 were proposed to be lower (200 feet AGL) than the minimum flight altitude of 300 feet AGL. [Defendants] will institute IR–178 segment altitudes that correspond with minimum flight altitudes *by raising the floor* of all segments of IR–178 to a minimum of 300 feet AGL.

Defendants fault Plaintiffs' selective editing of the above discussion contained in the AR and argue that reading the entirety of the paragraph reveals that Defendants intended to modify only those segments of IR–178 that were below 300 feet AGL. Defendants argue that Plaintiffs have failed to carry their burden to show that Defendants failed to fully discharge their responsibilities under NEPA or that the decision to implement the RBTI was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.

### Judicial Determination

■ An EIS must discuss mitigation in detail sufficient to ensure that environmental consequences have been fairly evaluated but need not contain a complete mitigation plan that is actually formulated and adopted. *Robertson,* 490 U.S. at 352, 109 S.Ct. 1835. *See also Laguna Greenbelt, Inc. v. United States DOT,* 42 F.3d 517, 528 (9th Cir.1994) (determining that NEPA does not require a fully developed plan which mitigates all environmental harm before an agency can act). "Even more significantly, it would be inconsistent with NEPA's reliance on procedural mechanisms—as opposed to substantive, result-based standards—to demand the presence of a fully developed plan that will mitigate environmental harm before an agency can act." *Robertson,* 490 U.S. at 353, 109 S.Ct. 1835.

For purposes of NEPA, "mitigation" is defined to include

(a) Avoiding the impact altogether by not taking a certain action or parts of an action.

(b) Minimizing impacts by limiting the degree or magnitude of the action and its implementation.

(c) Rectifying the impact by repairing, rehabilitating, or restoring the affected environment.

(d) Reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action.

(e) Compensating for the impact by replacing or providing substitute resources or environments.

40 C.F.R. § 1508.20.

In addition, the Court notes that regulations governing "minimum safe altitudes" specifically proscribe the following:

Except when necessary for takeoff or landing, no person may operate an aircraft below the following altitudes:

\* \* \*

(b) *Over congested areas.* Over any congested area of a city, town, or settlement, or over any open air assembly of persons, an altitude of 1,000 feet above the highest obstacle within a horizontal radius of 2,000 feet of the aircraft.

(c) *Over other than congested areas.* An altitude of 500 feet above the surface, except over open water or sparsely populated areas. In those cases, the aircraft may not be operated closer than 500 feet to any person, vessel, vehicle, or structure.

14 C.F.R. § 91.119(b)-(c).

First, this Court notes that § 91.119 does not specify a minimum altitude for flights over sparsely populated areas so long as the aircraft are no "closer than 500 feet to any person, vessel, vehicle, or structure." *Id.* Thus, military aircraft may fly below an altitude of 500 feet in a remote or "sparsely populated" MTR or MOA and still be within navigable airspace under the conditions permitted by the regulation. *Id.*

Second, Defendants have identified the unavoidable impacts of the low-level over-flights of the RBTI and have conducted a serious and thorough evaluation of the environmental mitigation options for the RBTI in accordance with NEPA's process-oriented requirements. The AR reveals that certain of Defendants' mitigation measures included (1) limiting annual sortie operations to 1,560/year; (2) increasing communications opportunities with civil aviators by creating a toll-free number to Dyess AFB for airspace schedule information; (3) establishing a military radar unit and real-time communications between military and general aviation aircraft; (4) reducing the potential for conflict between military flights and local aviation in the vicinity of the proposed reentry route on IR–178 by raising the floor of the reentry route to 6,000 feet MSL; (5) developing alternate locations for siting of en route ESS; and (6) limiting aircraft overflights to 5,000 feet AGL or higher when within three nautical miles of an en route ESS.

Third, concerning Plaintiffs' specific complaint in connection with mitigation of the minimum flight altitudes on segments of IR–178, this Court finds that a correct reading of Defendants' mitigation efforts instituting a minimum 300 foot AGL floor on some of IR–178's segments reveals that Plaintiffs' claims amount to nothing more than an exercise of chronic faultfinding and selective editing.

Finally, this Court finds that Plaintiffs' burden is not just to point out possible errors in Defendants' assumptions and methodology but to prove that the decisionmaker did not have the information necessary to make an informed decision. Plaintiffs have not done so.

Here, Defendants discussed mitigation measures in detail sufficient to ensure that the environmental consequences had been fairly evaluated and that the decisionmaker had adequate information to make an informed decision. Thus, this Court finds that Defendants have satisfied NEPA's requirements.

### N. ESS and Threat Emitter Sites

Plaintiffs briefly complain that Defendants' discussion of the health and safety issues associated with the ESS and threat emitter sites was not "particularly thorough."

Defendants argue that the potential adverse health effects of the ESS and threat emitter sites were fully discussed in the AR. Defendants acknowledged that radio frequency emissions from the sites could be absorbed by humans or animals as heat which causes body temperatures to rise. However, Defendants also note that 800–foot perimeter fences placed at each site, together with the warning horns and lights, keep humans from unwarranted exposure.

#### Judicial Determination

This Court's review of the AR and FEIS indicates that Defendants adequately discussed the potential health impacts of the ESS and threat emitter sites used in connection with the RBTI. Defendants presented the results of comprehensive compatibility tests *vis-à-vis* the potential hazards of human exposure to the radio frequency energy generated by the threat emitters. Defendants' tests presented worst-case scenarios and normal operations data and indicated that a safe separation distance sufficient to prevent exposure to the radio frequency energy generated by the emitters was 250 feet. The FEIS also indicated that, because the emitters are placed in the center of each completely fenced 15–acre site (800 feet square), Defendants have provided an additional 150 feet safe separation distance from the threat emitters' radio frequency exposure.

It is clear to this Court that Defendants objectively considered the potential adverse consequences of the radio frequency energy generated by the ESS and threat emitters and that the final decisionmaker had information sufficient to form a reasoned decision relative to this issue.

### O. Consultation with Other Government Entities

Plaintiffs next complain of Defendants' failure to properly engage state and local government officials and other governmental agencies in consultations regarding the potential adverse environmental impacts of the RBTI. Plaintiffs argue that Defendants' refusal to adequately coordinate NEPA's EIS procedural process with other state, local, and federal governmental agencies fails to satisfy the scoping requirements set out in the CEQ's enforcement regulations. Specifically, Plaintiffs complain that Defendants virtually ignored comments made by the EPA, that the FAA was not timely asked to become involved in the EIS process, and that the Texas Commissioner of Agriculture was not consulted.

In response, Defendants argue that they strictly adhered to the explicit timing requirements set forth in the CEQ regulations regarding public involvement and timely included all relevant state, local, and federal agencies in the EIS process. Defendants note that the FAA was included in the EIS process as early as December 1997, and the public participation Notice of Intent was also published in December 1997. Further, contrary to Plaintiffs' assertions that the Texas Commissioner of Agriculture was not consulted, Defendants point out that the Tex-

as Commissioner of Agriculture submitted five pages of comments regarding the DEIS in June 1999 and that Defendants addressed those concerns. Defendants argue that every effort was made to include all relevant agencies and the public, including holding extensive public scoping meetings, delivering more than 900 copies of the DEIS to affected agencies, the public, and designated repositories, and responding to more than 1,500 oral and written comments regarding the DEIS.

### *Judicial Determination*

The CEQ regulations require that an agency request comments from other federal agencies, appropriate state and local agencies, the public generally, and interested or affected persons or organizations. 40 C.F.R. § 1503.1. "After preparing a [DEIS] and before preparing a[n FEIS] the agency shall ... [r]equest the comments of ... [a]ppropriate State and local agencies which are authorized to develop and enforce environmental standards." *Id.* § 1503.1(a). In the FEIS, the agency must "discuss at appropriate points ... any responsible opposing view which was not adequately discussed in the [DEIS] and shall indicate the agency's response to the issue raised." *Id.* § 1502.9(b).

■ As to Plaintiffs' contention that Defendants never adequately addressed the EPA's comments, the FEIS clearly sets forth Defendants' response to the EPA's concerns. In addition, Plaintiffs' assertion is belied by Plaintiffs' acknowledgment that the EPA did, in fact, approve the FEIS. Regardless, however, NEPA merely requires agencies preparing an EIS to consider and respond to the comments of other agencies, not to agree with them. *Custer County Action Ass'n,* 256 F.3d at 1039. Plaintiffs have failed to establish a specific, relevant, local agency that Defendants overlooked in the EIS process or that such an oversight would

have been material to the decisionmaker's reasoning.

The AR also shows that, beginning in December 1997, Defendants initiated contact with the Texas Office of State and Federal Relations, the Governor of Texas, the Texas General Land Office, the Texas Forest Service, the Texas Parks and Wildlife Department, and three individual contacts with the Texas Historical Commission. In addition, in March 1999, the DEIS was mailed to twelve Texas state senators and representatives, the Texas Historical Commission, the Governor, the Texas General Land Office, and the Texas Parks and Wildlife Department. The FEIS contains the responses from the various state offices, as well as separate responses from the TxDot–Aviation Division, the Texas State Soil and Water Conservation Board, the Rio Grande Council of Governments, and the Texas Natural Resource Conservation Commission. Finally, the AR is replete with instances documenting Defendants' compliance with the CEQ scoping regulations, including public comments made and Defendants' responses thereto.

This Court is convinced that Defendants timely engaged the appropriate state, local, and federal agencies in the EIS process and conducted a comprehensive public scoping comment period extending from December 1997 through April 1998. Consequently, this Court concludes that Defendants satisfied NEPA's requirements and made the decision to implement the RBTI in cooperation with state, local, and other governmental officials in conformance with the law.

### *P. Cost/Benefit Analysis*

Plaintiffs complain that Defendants' cost/benefit analysis fails to comply with NEPA. Although Plaintiffs acknowledge that NEPA does not mandate that Defen-

dants perform a formal monetary analysis, Plaintiffs argue that NEPA does require agencies to develop methods to ensure that unquantified environmental amenities and values be given appropriate consideration.

Plaintiffs fault Defendants for their inability to quantify the costs of the RBTI while contemporaneously extolling the benefits of the RBTI. Plaintiffs assert that once Defendants chose to "trumpet the benefits" of the RBTI, Defendants were required to fully disclose and analyze the RBTI's concomitant costs.

Defendants argue that NEPA requires, at most, a broad, informal weighing of the merits and drawbacks of the proposed action, not a formal cost/benefit analysis. And, even then, the parameters of the review are limited only to those economic considerations so distorted as to impair fair consideration of the RBTI's environmental consequences.

Defendants assert that the greatest benefit of the RBTI is the linked airspace, the reduced low-value transit time, and the increased productive combat training time. Consequently, Defendants contend that a formal cost/benefit analysis was never contemplated because neither the operational considerations nor the environmental consequences lent themselves to an assignment of economic values.

Defendants argue that the "benefit" of a properly trained bomber aircrew cannot properly be analyzed against the "cost" of the associated drawbacks of the RBTI. Defendants claim that assigning a value to either would invite accusations that the benefits were overvalued while the costs were unduly minimized. Because the primary impetus behind the RBTI was not economic, and the ultimate decision to implement the RBTI was based on operational considerations, Defendants argue that a formal cost/benefit analysis was not required. Defendants argue that they fully complied with NEPA by identifying and discussing the merits of the RBTI and also describing in detail the potential impacts of the proposed action.

### Judicial Determination

While the Court is cognizant that neither NEPA nor the CEQ regulations define "cost/benefit analysis," the Fifth Circuit has concluded that a cost/benefit analysis "varies from a formal analysis in which all costs and benefits are quantified in an identical unit of measurement ... and compared, to an informal analysis where costs and benefits are identified, quantified if possible, and balanced." *Sigler*, 695 F.2d at 976–77 n. 15. In fact, a "more informal analysis is preferred 'when there are important qualitative considerations.'" *Id. See also* 40 C.F.R. § 1502.23 (providing that "the weighing of the merits and drawbacks of the various alternatives need not be displayed in a monetary cost-benefit analysis and *should not be* when there are important qualitative considerations") (emphasis added).

▪ Finally, a court must consider "whether the economic considerations, against which the environmental considerations are weighed, were so distorted as to impair fair consideration of those environmental consequences." *S. La. Envtl. Council, Inc.*, 629 F.2d at 1011. "In other words, the agency is free to take the most environmentally costly course of action or alternative, so long as the environmental impact is fully identified in the EIS and the agency determines that 'other values' outweigh the impact on the environment." *Citizens Concerned About Jet Noise*, 48 F.Supp.2d at 589.

Here, this Court is persuaded that Defendants conducted an appropriate informal weighing of the merits and drawbacks of the RBTI consistent with Defendants' reasonably stated purpose

and need. The AR repeatedly indicates that the thrust of the RBTI was to provide integrated airspace to maximize quality training time and to minimize unproductive transit time. Plaintiffs have not established that Defendants' proposed action was primarily driven by economic considerations or that Defendants painted a picture of unduly optimistic economic benefits while simultaneously minimizing the potential adverse environmental consequences. Thus, this Court is convinced that a formal cost/benefit analysis was not required.

Because Defendants were not required to prepare a formal cost/benefit analysis, Defendants were not required to assign specific dollar values to the expected benefits of the RBTI. Rather, Defendants were required to balance the favorable and adverse effects of the agency action, and this Court finds that Defendants did so. A review of the AR and FEIS indicates that Defendants conducted a reasonably thorough discussion of the significant aspects of the environmental and economic factors of the RBTI and that Defendants did not justify their decision based on economic considerations. Nothing more was required.

### Q. The AR

Plaintiffs first argue that the AR before the Court improperly omitted an internal communication between employees of the United States Fish and Wildlife Service ("USFWS") with regard to bird strike avoidance. Plaintiffs contend that this communication was attached to HEPA's response to the DEIS. Second, Plaintiffs contend that Defendants improperly omitted a USFWS memo to the United States Department of the Interior which (1) suggested that Defendants correct alleged communication dates and update the list of threatened and endangered species under the Endangered Species Act ("ESA"); (2) suggested that Defendants conduct field surveys with regard to designated sensitive species; and (3) took issue with Defendants' Ldn noise analysis.

Plaintiffs next argue that Defendants improperly included in the AR a post-ROD USFWS letter to Defendants responding to Defendants' request for the USFWS's concurrence with the biological evaluation for the RBTI. Plaintiffs also accuse Defendants of improperly including a post-ROD document which sets forth the final threat emitter sites which obviously could not have been considered by the final decisionmaker.

Defendants reiterate their previous argument that not all attachments to HEPA's voluminous record must be included in the AR. In any event, Defendants point out that the employee communication which Plaintiffs claim was omitted from the AR was, in fact, specifically referenced therein. Further, Defendants assert that the USFWS letter was from one USFWS employee to another and that there is no indication that Defendants ever received it. Moreover, there is no indication that the letter was ever directly or indirectly considered by the decisionmaker; however, Defendants note that a nearly identical letter sent by the Department of the Interior to Defendants was included in the AR.

Next, Defendants argue that including in the AR the USFWS's final comments with regard to the RBTI's effects on wildlife and sensitive species was logical and proper, because implementation of the selected alternative could not begin until the document was received. Likewise, because Defendants committed to withholding implementation of the RBTI until any final mitigation measures were known, Defendants argue that including the comments and correspondence from the various his-

toric preservation societies was also logical and proper and that Plaintiffs' arguments are without merit.

### Judicial Determination

With regard to Plaintiffs' argument that one of the attachments to HEPA's response to the DEIS was not included in the AR, the Court directs the parties to the Court's discussion set forth *supra* in "A. Hard Look." Further, this Court finds that, although the AR is not perfect, "it is entirely unreasonable to think that Congress intended for an impact statement to document every particle of knowledge that an agency might compile in considering the proposed action." *Van Winkle*, 197 F.Supp.2d at 603. Rather, "the detail required is that sufficient to enable those who did not have a part in [the EIS's] compilation to understand and consider meaningfully the factors involved." *Id.*

With regard to Plaintiffs' complaints that documents were erroneously excluded and/or included in the post-ROD AR, Plaintiffs have failed to show that the allegedly improper omissions or inclusions in any way affected the determination of the final decisionmaker or constituted prejudicial error or that Defendants committed a clear error of judgment. Rather, this Court is of the opinion that Plaintiffs' complaints with regard to the few documents at issue amount to nothing more than hypercritical fly-specking and that Defendants have satisfied the criteria for compliance with NEPA. In addition, it appears to this Court that Plaintiffs' selective citation to the AR failed to recognize Defendants' continued refinement of the methodology used in order to ensure the most accurate information. Accordingly, Plaintiffs' objections must fail.

### R. Endangered Species Act

Plaintiffs, on the one hand, complain that the FEIS failed to include any information about how aircraft emissions and other pollutants would impact endangered, threatened, or sensitive plants, fish, birds, and other species. Plaintiffs also contend that the AR contained no indication that Defendants intended to comply with relevant endangered and threatened species legislation and/or regulations.

Defendants, on the other hand, argue that consultation with the USFWS began in December 1997 and that Defendants fully described the proposed RBTI, provided maps of the area potentially affected, and requested information on threatened, endangered, candidate, and proposed species lists and concentration sites relevant to the affected environment. Defendants point out that the USFWS first responded in January 1998 and that both formal and informal consultation continued thereafter throughout the NEPA process.

### Judicial Determination

The ESA requires that every federal agency "insure that any action authorized, funded, or carried out by such agency ... is not likely to jeopardize the continued existence of any endangered species or threatened species." 16 U.S.C. § 1536(a)(2) (2000).

Here, the FEIS revealed that endangered/threatened flora and fauna species lists were obtained by Defendants from, *inter alia*, the USFWS, the New Mexico Department of Game and Fish, and the Texas Parks and Wildlife Department. The AR also revealed that Defendants consulted with the USFWS on an ongoing basis concerning actions which overlapped the RBTI area and that various state agencies were consulted in connection with species of specific concern to each state. The FEIS also reflected Defendants' avowal that "[c]ompliance with the [ESA] for [the] RBTI has been and will continue

to be part of the broader consultation effort."

Further, the FEIS sets forth the results of Defendants' analysis of the impact of aircraft emissions on threatened wildlife for each alternative. The analysis concluded that emissions would produce minimal quantities of criteria pollutants and that ground-level pollutants would be fractions of federal and state standards. Finally, the Court's holistic review of the AR reveals that Defendants consulted continuously with the USFWS throughout the RBTI NEPA process, including formal comments on the DEIS; a status meeting to discuss the endangered species issues; and numerous telephone conferences, letters, and e-mail communications.

Consequently, this Court is convinced that Plaintiffs' assertions that (1) Defendants failed to discuss the effects of aircraft pollutants or (2) Defendants in any way indicated an intention to not comply with legislation and/or regulations pertinent to endangered or threatened species are wholly without merit.

## CONCLUSION

This Court has made a conscientious effort to fully review the RBTI FEIS, ROD, AR and any allowed supplementation, and all other relevant data and material which was available to the decision-maker, as well as each objection raised and counterargument made by the parties. In so doing, the Court has purposefully conducted its review with unwavering adherence to the important goals sought to be achieved by NEPA.

Although this Court finds that Defendants' documentation sometimes suffered from a slight subjective bias, the Court nevertheless carefully applied the rule of reason and practicality and fully considered the relevant environmental and economic factors presented by Defendants'

AR, FEIS, and ROD. As a result, this Court is convinced that Defendants adequately considered the potential adverse environmental consequences of the RBTI.

In determining that Defendants have satisfied the requirements of NEPA, this Court finds that (1) Defendants in good faith objectively took a hard look at the environmental consequences of the proposed RBTI and alternatives; (2) the FEIS provided detail sufficient to allow those who did not participate in its preparation to understand and consider the pertinent environmental influences involved; and (3) the FEIS's explanation of alternatives was sufficient to permit a reasoned choice among different courses of action. Therefore, this Court finds that Defendants' decision to implement the RBTI was made in good faith after consideration of sufficient possible alternatives, mitigation measures, and other relevant factors and that the decision was not arbitrary, capricious, an abuse of discretion, or otherwise not in conformance with the law. Therefore, after considering all the relevant arguments and evidence, this Court **DENIES** Plaintiffs' Motion for Summary Judgment.

Further, after considering all the relevant arguments and evidence, the Court **GRANTS** Defendants' Motion to Strike Extra–Record Declarations and Materials Attached to Plaintiffs' Motion for Summary Judgment; **GRANTS** Plaintiffs' Motion to Strike Defendants' Declarations; **GRANTS** Defendants' Motion to Strike Materials Attached to Plaintiffs' Reply in Support of Motion for Summary Judgment and Response to Defendants' Cross–Motion for Summary Judgment; and **GRANTS** Defendants' Cross–Motion for Summary Judgment.